SLT/TMM
F.#2011R00278

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

                                   12-CR-065 (SLT)

    - against -

JIMMY COURNOYER <u>et</u> <u>al</u>.,

                   Defendants.

- - - - - - - - - - - - - - - - X

THE GOVERNMENT'S RESPONSE IN OPPOSITION TO
DEFENDANT JIMMY COURNOYER's PRETRIAL MOTIONS

                                  LORETTA E. LYNCH
                                  United States Attorney
                                  Eastern District of New York

Steven L. Tiscione
Toni M. Mele
Celia A. Cohen
Assistant U.S. Attorneys
    (Of Counsel)

PRELIMINARY STATEMENT

The defendant Jimmy COURNOYER moves to dismiss the instant indictment on the grounds that his denial of entry and expulsion from Mexico on the basis of a validly-issued arrest warrant constitutes a forcible kidnaping in contravention of Due Process and basic principals of international law.  Relying on a legal basis that has been expressly overturned and is contrary to established Supreme Court precedent, COURNOYER claims that the District Court should nonetheless divest itself of personal jurisdiction over him and order his repatriation to Canada because he was tortured and unlawfully detained by Mexican authorities at the express direction of unspecified U.S. officials.

COURNOYER next argues that the Court should disregard the long-standing tenant that a criminal prosecution should be retained in the district in which it is originally indicted in favor of transferring the case to the Northern District of New York, despite the fact that none of the seven defendants reside in the Northern District, none of the attorneys of record maintain offices in that district, none of the defendants are charged with committing criminal acts in that district, none of the defendant's purported witnesses reside in that district and a transfer would result in a massive waste of judicial resources by requiring at least two separate multi-week trials in different districts utilizing virtually the same evidence and witnesses.

Finally, COURNOYER moves for a severance from his co-defendants on the grounds that his defense is mutually exclusive from those of his co-defendants since he is alleged to be the leader of the international criminal enterprise charged in the instant indictment and will inevitably be subject to the "finger-pointing" of his less-culpable co-defendants.  At the same time, COURNOYER argues that he would be substantially prejudiced by unspecified evidence that could only be admitted against his co-defendants.

For the reasons set forth below, the defendant's motions are without merit and should be denied in their entirety.

## STATEMENT OF FACTS

A.  Background of the Investigation

Since approximately 2007, the Long Island District Office of the Drug Enforcement Administration ("DEA") Task Force has been investigating several large-scale international drug trafficking organizations based in Montreal, Canada that have formed a consortium along with a number of marijuana brokers and distributors in the United States and are actively working together to define the various territories for drug distribution, set prices and provide transportation for drug smuggling ventures (the "Consortium").  One of the principal members within the Consortium has been identified as JIMMY COURNOYER, also known as "Cosmo."  The investigation has revealed that in just the past

3

two or three years COURNOYER coordinated the importation and distribution of more than 100,000 pounds of hydroponic marijuana into the United States, specifically to Brooklyn and Queens, New York, from Canada.  COURNOYER also arranged to transport vast quantities of marijuana proceeds from New York to California on behalf of the Consortium.  The marijuana proceeds were then used to purchase cocaine that was exported into Canada for distribution.  This trade-based money laundering scheme resulted in enormous profits.

The investigation further revealed that MARIO RACINE, also known as "Olivier Racine" and "Diego," and PATRICK PAISSE, also known as "Peg-leg," were organizers and managers within the Consortium based in Montreal, Canada.  At the behest of COURNOYER, the leader of the Consortium, RACINE, PAISSE and their associates met with various Canadian sources of supply to obtain high-grade hydroponic marijuana.  RACINE and PAISSE subsequently arranged for the transportation of marijuana into the United States and coordinated the laundering of drug proceeds back to Canada.  Specifically, RACINE, PAISSE and their underlings smuggled in excess of $1 million dollars to Canada in order to fund additional marijuana shipments (or directed others to do so).  All of the money they transported was generated from the sale of marijuana in New York.

During the course of the investigation, DEA Task Force agents received information about the Consortium from multiple cooperating witnesses, whose information has proven to be reliable and has led to multiple arrests and seizures of drugs and drug proceeds, including the recent seizures of approximately 50 kilograms of cocaine and approximately $1,500,000.00. The investigation revealed that the Consortium utilized a garage in Brooklyn, New York where the marijuana was transported in trucks from Montreal, Canada and unloaded. From there, marijuana was sold in Brooklyn, New York and the surrounding areas. COURNOYER employed a multitude of workers in New York to distribute the marijuana, collect the marijuana proceeds, and deliver the drug proceeds to various bulk cash transporters selected who transported the money to Los Angeles, California for the purchase of cocaine.

Among other methods, one of the principal ways in which COUNROYER and his enterprise smuggled illegal narcotics into the United States was to utilize the Akwesasne native American Reservation, which straddles the U.S. - Canadian border in upstate New York. Employing Native American transportation networks, COURNOYER and RACINE arranged for marijuana to be brought by boat across the St. Lawrence River from Canada onto the reservation, where drivers would take possession of the marijuana and transport it across the border into the United

States and then deliver it to CASTILLO-MEDINA and other distributors in Brooklyn, New York.

COURNOYER and RACINE supplied high level members of his organization with encrypted blackberry devices to communicate with him.  The devices were rotated on a frequent basis, could be used only to send encrypted text messages to other blackberry devices on the same network and could be erased instantly if lost or seized by law enforcement.

COURNOYER also arranged for multiple firearms and ammunition to be smuggled into Canada from the United States for use by COURNOYER and members of his drug organization, including several 9mm handguns.

Until approximately November 2010, COURNOYER's primary marijuana distributor in Brooklyn was co-defendant JOSE ALEJANDRO CASTILLO-MEDINA, also known as "Primo."  CASTILLO-MEDINA sold hundreds of pounds of marijuana per week supplied by COURNOYER, and arranged for the collection of tens of millions of dollars in narcotics proceeds.  By 2009, COURNOYER was sending at least 1000 pounds of marijuana to New York per week, and was planning to expand his business to send 5000 pounds of marijuana per week.

In November 2010, law enforcement agents executed a search warrant on a Brooklyn residence used by CASTILLO-MEDINA and his workers to store narcotics and narcotics proceeds. Inside the residence, law enforcement officers found marijuana,

6

two money counting machines and a bag containing more than
$500,000.00 in U.S currency.  Law enforcement officers further
recovered a drug ledger with dates of transactions and amounts of
narcotics proceeds totaling over $3 million dollars that
CASTILLO-MEDINA had collected on behalf of the Consortium.

COURNOYER also employed other marijuana distributors in
the New York area, including co-defendant JOHN TASCHETTI.  On or
about April 24, 2011, COURNOYER arranged a money pickup of
approximately $200,000.00 from TASCHETTI in Brooklyn, New York.
Specifically, COURNOYER directed an associate to obtain the cash
from TASCHETTI in Brooklyn and bulk ship the money to other
criminal associates who were managing operations in Los Angeles,
California - ALESSANDRO TALONI and BOBBY GALEBI.  DEA agents
conducting surveillance observed TASCHETTI provide the money to
an intermediary working on behalf of COURNOYER's money launderer,
who in turn sent the money to California.

On or about April 28, 2011, DEA agents in Los Angeles,
California placed a consensual phone call to COURNOYER's criminal
associates in order to arrange the delivery of $188,000 - - the
money received from COURNOYER's New York marijuana distributor
less the commission for the currency transportation.  An
undercover Los Angeles DEA agent ("UC1") spoke with a male caller
later identified as ALESSANDRO TALIONI and coordinated the
location for the money drop.  UC1 subsequently went to the target

7

location and met with defendants BOBBY GALEBI and ALESSANDRO
TALONI, who were driving a Mercedes Benz sedan.  UC1 handed over
a brown paper bag containing the $188,000 to GALEBI and TALONI.
Los Angeles DEA agents then followed the Mercedes Benz driven by
GALEBI and TALONI to the Beverly Hills Hotel where they saw the
men load two large black suitcases into the Mercedes Benz.  Then
agents then followed the same Mercedes Benz to 124 S. Canon
Drive, Beverly Hills, California where DEA agents observed TALONI
place a small black bag into the trunk of the Mercedes Benz, and
also observed GALEBI holding a brown paper bag that appeared to
be the same bag containing the $188,000.  DEA agents also
observed GALEBI enter 124 S. Canon Drive, Apartment E.  Shortly
thereafter, law enforcement officers conducted a traffic stop of
the Mercedes Benz.  During a consent search of the vehicle,
$66,400 was found inside a gray gym bag in the trunk.  A pat down
of the driver resulted in the seizure of $20,267.  Thereafter,
GALEBI signed a consent to search form for his residence.  A
consent search was performed at 124 S. Canon Dr., apartment E.
Inside that apartment, law enforcement found $805,905 inside two
suitcases and a duffel bag, as well as approximately 49 kilograms
of cocaine.  Law enforcement also performed a consent search of
TALONI's residence and seized $94,000, for a total of $899,905.

        Two additional undercover operations were conducted,
during which COURNOYER directed associates to pick up hundreds of

thousands of dollars in marijuana proceeds from TASHETTI in Brooklyn and ship the money to co-conspirators in California.

    B.    The Indictment

         On January 20, 2012, a grand jury in the Eastern District of New York returned an indictment charging the defendant JIMMY COURNOYER with: (1) engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848 (Count One); (2) conspiracy to import 1,000 kilograms or more of marijuana in violation of 21 U.S.C. §§ 952(a), 960(b)(1)(G), and 963 (Count Two); (3) conspiracy to distribute 1,000 kilograms or more of marijuana between January 2002 and October 2011 in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(vii) (Count Three); (4) conspiracy to export five kilograms or more of cocaine in violation of 21 U.S.C. §§ 953(a), 960(b)(1)(B)(ii) and 963 (Count Four); conspiracy to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(ii) (Count Five); using and carrying firearms in furtherance of drug trafficking crimes in violation of 18 U.S.C. § 924(c) (Count Six); and conspiracy to launder narcotics proceeds in violation of 18 U.S.C. § 1956(h) (Count Seven).  Co-defendants MARIO RACINE, JOSE ALEJANDRO CASTILLO-MEDINA, PATRICK PAISSE and JOHN TASCHETTI were charged, along with COURNOYER, in Counts Two and Three.  Defendants RACINE, BOBBY GALEBI and ALESSANDRO TALONI were charged along with COURNOYER in Counts Four and Five.  All

9

of the defendants were charged in Count Seven.

Shortly after the indictment was returned, the United States requested the issuance of a Red Notice through the International Criminal Police Organization (commonly known as "Interpol"). These notices are the closest instrument to an international arrest warrant in use today, and serve to alert all Interpol member countries of an outstanding arrest warrant and requests the provisional arrest of a fugitive defendant for purposes of extradition.

    C.    The Arrest of COURNOYER

On February 16, 2012, less than a month after the indictment was returned, COURNOYER was stopped at the Cancun International Airport, attempting to gain entry into Mexico. Based on the outstanding Interpol Red Notice, Mexican immigration authorities denied COURNOYER entry into Mexico and attempted to expel him from the country. Specifically, they informed COURNOYER that he was being denied entry into the country and escorted him to a commercial airline bound for Canada with a layover in Los Angeles, California. Upon being denied entry into Mexico and told he was being expelled, COURNOYER became violent and physically resisted Mexican immigration authorities. As a result, COURNOYER had to be removed from the flight. Over the course of the next 24 hours, Mexican immigration authorities made at least two additional attempts to escort COURNOYER to an

10

outbound commercial flight to Canada.  On each occasion, COURNOYER had to be removed from the plane after physically resisting and threatening to harm the captain and crew.  Each of these flights from Mexico to Canada included a stop-over in the United States.  The following day, Mexican authorities finally succeeded in expelling COURNOYER by sending several Mexican law enforcement officers onto a commercial flight to accompany him. As with all of the previous aborted flights, the flight included a scheduled stop-over in the United States.  When the flight landed in Houston, Texas for a scheduled refueling, COURNOYER was placed under arrest by federal agents, who had been alerted to his pending arrival by Mexican officials.  He was subsequently arraigned in the Southern District of Texas on February 21, 2012 and ordered to be removed to the Eastern District of New York.

**ARGUMENT**

POINT ONE

COURNOYER'S MOTION TO DISMISS

A.   The Court Has Jurisdiction over the Indictment, and COURNOYER is Not Entitled to Dismissal of the Indictment, Repatriation to Canada or an Evidentiary Hearing Based on His Due Process Claim

COURNOYER moves to dismiss the indictment against him for lack of personal jurisdiction.  COURNOYER's motion is premised on a violation of Due Process, stemming from what he claims was an "illegal abduction" from Mexico during which time he was subjected to conduct that rose "to the level of torture."

11

Def. Mem. at 9.  COURNOYER alleges, without any factual support, that the United States was directing the actions taken by Mexican immigration officials.  He relies on United States v. Toscanino, 500 F.2d 267 (2d Cir. 1974) for the proposition that divesting of jurisdiction is appropriate where it was acquired through "the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights."  United States v. Toscanino, 500 F.2d 267 at 275.  COURNOYER therefore requests that the Court dismiss the indictment against him and issue an order mandating his repatriation to Canada, or, in the alternative, grant an evidentiary hearing on his claim.  Def. Mem. at 1.

COURNOYER's motion to dismiss the indictment should be denied without the need for an evidentiary hearing.  As articulated below, long-standing Supreme Court precedent dictates that a criminal defendant cannot challenge the manner in which he was brought before the court on due process grounds.  Moreover, the narrow exception to this rule articulated in Toscanino has never resulted in the dismissal of an indictment and was essentially vitiated by subsequent Supreme Court cases.  Furthermore, COURNOYER's claim of brutal mistreatment is wholly without merit and his assertions of United States involvement are entirely speculative and bereft of any evidentiary support.

12

1. <u>Legal Standard</u>

The Due Process Clause provides that no person shall be deprived of liberty without due process of the law. However, under what is commonly referred to as the <u>Ker-Frisbie</u> doctrine, a defendant cannot challenge the manner in which he was brought before the court in the United States following arrest or detention in another jurisdiction. <u>See</u> <u>Ker v. Illinois</u>, 119 U.S. 436 (1886); <u>Frisbie v. Collins</u>, 342 U.S. 519 (1952). As articulated by the Court in <u>Frisbie</u>, "[t]he power of a court to try a person for [a] crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction,'" and "due process of law is satisfied when one present in court is convicted of [a] crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards." <u>Frisbie</u>, 342 U.S. at 522. <u>See also</u> <u>United States v. Yousef</u>, 2011 WL 2899244 (S.D.N.Y. June 30, 2011) (holding that the method used to secure a defendant's appearance does not strip the Government of the power to prosecute that defendant).

The Supreme Court recently reaffirmed the validity of the <u>Ker-Frisbie</u> doctrine in <u>United States v. Alvarez-Machain</u>, 504 U.S. 655 (1992), holding that the rule of <u>Ker v. Illinois</u> is "fully applicable" unless the accused's abduction was in violation of the specific terms of the Extradition Treaty between

13

the United States and the country where the abduction took place. <u>Alvarez-Machain</u>, 504 U.S. 655 at 669.  Thus, if a court finds that the treaty agreement between the two countries "does not prohibit respondent's abduction, <u>the rule in Ker applies</u>, and the court need not inquire as to how respondent came before it." <u>Alvarez-Machain</u>, 504 U.S. at 663(emphasis added).  <u>See also</u> <u>U.S. ex rel Lujan v. Gengler</u>, 510 F.2d 62, 65 (2d Cir. 1975) (noting that the [<u>Ker-Frisbie</u>] doctrine has never been disavowed by the Supreme Court); <u>United States v. Ghailani</u>, 751 F.Supp.2d 502, 505 (S.D.N.Y. 2010) (recognizing that the Supreme Court has repeatedly reaffirmed the <u>Ker-Frisbie</u> rule even as the concept of due process has expanded)

In order to find that an extradition treaty bars illegal kidnappings from the cooperating countries such that the <u>Ker-Frisbie</u> doctrine might not foreclose an illegal abduction claim, "the language of the Treaty, in the context of history," must support the determination.  <u>Alvarez-Machain</u>, 504 U.S. at 666.  The Supreme Court has firmly rejected the argument that general principles of international law can or should be relied upon to read illegal kidnaping prohibitions into otherwise silent extradition treaties. <u>Id</u>. (rejecting petitioner's contention that "international abductions are so clearly prohibited in international law" that the Mexican-American treaty should be read to include such a prohibition, despite a formal objection by

14

the Mexican Government to the kidnapping).

    2.    COURNOYER Was Not Illegally Abducted and the Ker-
          Frisbie Doctrine Nonetheless Bars His Claim

COURNOYER cannot bring a successful due process claim based upon the method used to obtain jurisdiction over him.  As the case law makes clear, a defendant cannot object to jurisdiction unless a treaty between the United States and the affronted nation is violated.  Here, COURNOYER was not abducted from Mexico.  Rather, Mexican officials rejected COURNOYER from their country.

The relevant facts are not in dispute.  COURNOYER boarded a flight from Canada to Mexico that landed at the Cancun International Airport.  When he landed, Mexican immigration officials refused to allow him to enter into the country.  Officials attempted to place COURNOYER on three commercial flights bound for Canada, all of which he refused to board.  Finally, COURNOYER was forcibly placed on a fourth flight that had a stopover at Houston International Airport, where he was arrested by DEA agents who had been alerted to his arrival.

COURNOYER was not abducted from Mexico.  Rather, Mexico exercised its right to deny COURNOYER entry, and the United States exercised its right to arrest COURNOYER when he entered into the territory of the United States.  While it is true that the United States and Mexico have an extradition treaty that spells out the procedures that must be followed if an extradition

15

is to occur, no extradition took place.  Thus, no rules governing extradition treaties apply.

COURNOYER further alleges, without any support in the case law, that the United States obtained jurisdiction over his person in violation of the "sovereignty, laws and values of the United States' long-standing ally, Canada." Def. Mem. at 8. COURNOYER relies upon the <u>Alvarez-Machain</u> dissent for the proposition that international law was violated in his case. Setting aside that the dissent holds no precedential force, reliance on its language and sentiment is wholly misplaced.

The dissenting justices in <u>Alvarez-Machain</u> were primarily concerned with the territorial integrity of nations. <u>See</u> <u>Alvarez-Machain</u>, 504 U.S 655, 674-675 (arguing that extradition treaties "imply a mutual undertaking to respect the <u>territorial integrity</u> of the other contracting party") (emphasis added); see also Def. Mem at 12.  The petitioner himself interprets the dissent to be arguing that "common sense tells us that it was assumed by the parties to the US-Mexican extradition treaty that they could not kidnap each other's citizens in each other's territory." Def. Mem. at 11.

Implicitly conceding that this argument does not help him, since Mexico expelled him from its own territory, COURNOYER asks the Court to make a huge leap, and find that the Canada-US extradition treaty should be read to implicitly prohibit

16

extraterritorial kidnapings. Def. Mem. at 12.  This argument
makes little logical sense.  Since COURNOYER voluntarily left the
territory of Canada, and was neither detained nor arrested there,
the "territorial integrity" of Canada is in no way compromised by
COURNOYER's detention and expulsion from Mexico, nor is it
threatened by extraterritorial arrests of Canadian citizens in
general.

     Nor does COURNOYER's motion find any support based on
his wholly unsubstantiated and speculative assertion that the
United States government somehow "ordered" the Mexican government
to deny his entry, mistreat him, and deliver him to the United
States.  (Def. Mot. at 8).  The United States government has no
power to "order" or "direct" the Mexican government to deny entry
or expel an individual from Mexico.  "At best, the United States
could request his expulsion, but the decision to expel was that
of a sovereign state."  Yousef, 2011 WL 2899244 at *8.

     In United States v. Blanchard, 2011 WL 3423334 (D.
Vermont Aug. 4, 2011), the district court rejected a claim nearly
identical to that made by COURNOYER.  Specifically, the defendant
in Blanchard, a Canadian citizen, was detained when he attempted
to enter Mexico and expelled to the United States at the request
of U.S. officials.  Like COURNOYER, Blanchard was escorted onto a
commercial airline by agents from the Mexican government and
boarded a flight to Canada with a scheduled lay-over in the

17

United States.  Once the plane arrived in Los Angeles, Blanchard
was arrested by U.S. agents, who had been alerted to his
impending arrival by Mexican officials.  Despite the fact that
the Canadian government had previously rejected a request for
extradition of the defendant by the United States, the district
court held that "there has been no showing that the extradition
treaties have been violated in any way.  The Supreme Court in
Alvarez-Machain found even a forcible abduction from Mexico did
not violate the extradition treaties of that country, and there
is nothing in the Canadian extradition treaty which prohibited
Mexico from delivering the Defendant to Los Angeles under these
facts."  Blanchard, 2011 WL 3423334 at * 3.

        Accordingly, since COURNOYER cannot demonstrate that he
was brought to the United States in violation of any
international agreements with Mexico or Canada, the Ker-Frisbee
Doctrine precludes the Court from divesting itself of
jurisdiction over him.

        3.    The Exception to the Ker-Frisbee Doctrine that Was
              Previously Carved Out by the Second Circuit in United
              States v. Toscanino Is No Longer Good Law

        Relying on United States v. Toscanino, 500 F.2d 267 (2d
Cir. 1974), COURNOYER contends that an exception to the Ker-
Frisbee doctrine exists where jurisdiction has been acquired "as
the result of the government's deliberate, unnecessary and
unreasonable invasion of the accused's constitutional rights."

18

Id. at 275.  Specifically, COURNOYER argues that his "torture" at
the hands of Mexican officers requires the court to divest itself
of jurisdiction despite the Ker-Frisbee doctrine.

Defendant's reliance on Toscanino is unavailing for
several reasons.  First, subsequent Supreme Court rulings have
cast considerable doubt on the continued viability of Toscanino,
and it is considered to be a "dead letter" by virtually every
court that has considered the issue in more than two decades.
Second, COURNOYER fails to set forth any specific involvement by
the United States government in his alleged "abduction" and
"torture" by Mexican immigration and law enforcement officers
beyond cursory allegations that the Mexican officers *must have
been* acting as agents of the U.S. government since COURNOYER was
arrested by federal agents upon his arrival in the United States.
Finally, Toscanino has been limited to its truly shocking facts,
a standard which COURNOYER's claim does not begin to reach.

Three major premises upon which the Toscanino holding
stood have been rejected by subsequent case law.  As such, courts
in this Circuit and several others have held that "Toscanino is
no longer good law."  U.S. v. Umeh, 762 F.Supp.2d 658 (S.D.N.Y.
2011).

First, Toscanino predicted that the Ker-Frisbie
doctrine would be deemed irreconcilable with Supreme Court's
contemporary notions of due process.  This has been discounted by

19

the Supreme Court itself, which has upheld the validity of the
Ker-Frisbie doctrine five times since Toscanino.  See Alvarez-
Machain, 504 U.S. at 670 (affirming Ker-Frisbie and holding that
accused's abduction did not prohibit his prosecution);
Immigration & Naturalization Serv. v. Lopez-Mendoza, 468 U.S.
1032 at 1039 (stating that the illegality of a defendant's
detention cannot deprive the government of the opportunity to
prove his guilt); U.S. v. Crews, 445 U.S. 463 at 474 ("an illegal
arrest, without more, has never been viewed as a bar to
subsequent prosecution"); Stone v. Powell, 428 U.S. 465 at 485
("judicial proceedings need not abate when the defendant's person
is unconstitutionally seized); Gerstein v. Pugh, 420 U.S. 103 at
119 (affirming the established rule that illegal arrest does not
void a subsequent conviction).

Second, Toscanino was premised on a finding that a
person's body may represent the fruit of the government's
exploitation.  This too has been directly invalidated by the
Supreme Court.  See I.N.S. v. Lopez-Mendoza, 468 U.S. 1032, 1039
(1984); United States v. Crews, 445 U.S. 463, 474 (1980);
Gerstein v. Pugh, 420 U.S. 103, 119 (1975).

Third, the holding in Rochin v. California, 342 U.S.
165 (1952), which was heavily relied upon by the Toscanino court
and is relied upon by COURNOYER in his brief has also been
severely limited by subsequent cases.  Specifically, Rochin was

limited by the Supreme Court to stand "at most for the proposition that a prosecution may effectively be foreclosed by exclusion of evidence tainted by a Fourth Amendment violation." Brown v. Doe, 2 F.3d 1236, 1243 (2d Cir. 1993); See United States v. Crews, 445 U.S. 463, 474 (1980).  In Crews, the Supreme Court clarified that "precedents ordering the exclusion of such illegally obtained evidence assume implicitly that the remedy does not extend to barring the prosecution all together."  Crews, 445 U.S. 463 at 474.  Furthermore, since a person's body cannot be considered a "fruit" to be excluded, see, e.g., I.N.S. v. Lopez-Mendoza, 468 U.S. 1032, 1039 (1984), Rochin cannot be relied upon to sustain a dismissal of a claim based on illegal abduction.

Since the erosion of the Toscanino reasoning, the validity of Toscanino has been directly questioned, or outright rejected, by multiple district courts in the Second Circuit. See, e.g., United States v. Umeh, 762 F.Supp.2d 658, 663 (S.D.N.Y. 2011) ("[T]he fact that both of the pillars on which [Toscanino] rests have been removed suggests that all that remains is a rhetorical facade wholly lacking in legal foundation."); United States v. Ghailani, 751 F.Supp.2d 502, 507 (S.D.N.Y. 2010) (noting that "it is doubtful that Toscanino remains authoritative," particularly in light of the Second Circuit's reliance on Ker-Frisbie in Brown v. Doe, 2 F.3d 1236

(2d Cir. 1993)).  The courts of other circuits have similarly concluded that Toscanino is no longer valid law.  See United States v. Best, 304 F.3d 308, 312–13 (3d Cir. 2002) ("In light of these cases, it appears clear that the Ker–Frisbie doctrine has not eroded and that the exception described in Toscanino rests on shaky ground."); United States v. Mitchell, 957 F.2d 465, 470 (7th Cir. 1992) (questioning Toscanino's "continuing constitutional vitality" in light of the Supreme Court's repeated reaffirmation of the Ker–Frisbie doctrine); Matta–Ballesteros v. Henman, 896 F.2d 255, 261 (7th Cir. 1990) ( "We ... conclude that Toscanino, at least as far as it creates an exclusionary rule, no longer retains vitality and therefore decline to adopt it as the law of this circuit."); United States v. Darby, 744 F.2d 1508, 1531 (11th Cir. 1984) ("[T]he continuing validity of the Toscanino approach is questionable after the intervening decision in Gerstein v. Pugh").

Accordingly, COURNOYER's motion relies entirely upon an exception to the Ker–Frisbee doctrine that simply no longer exists.

4.  COURNOYER's Allegations Would Not Justify Dismissal of the Indictment Even if Toscanino Were Still Viable

Even if this Court were to decide that some vestige of the Toscanino decision lingers despite the reasoning of virtually every other court that has considered Toscanino in the past two decades, a "[d]efendant must put forth truly disturbing facts to

22

justify due process relief; otherwise, dismissal of the
Indictment is unwarranted." _Yousef_, 2011 WL 2899244 (S.D.N.Y.
June 30, 2011).  Even taking all of COURNOYER's statements as
true, he is unable to meet the standard set forth by _Toscanino_
and subsequent cases considering the _Toscanino_ exception.

In order to prevail on a claim that the _Toscanino_ rule
applies, the court must find "that the gross mistreatment leading
to the forcible abduction of the defendant was perpetrated by
representatives of the United States Government." _United States_
_v. Lira_, 515 F.2d 68, 70 (2d. Cir. 1975).  A hearing is not
warranted unless the defendant first offers some credible
supporting evidence, "including specifically evidence that the
action was taken by or at the direction of United States
officials." _Toscanino_, 500 F.2d at 281.

COURNOYER has offered absolutely no supporting evidence
in connection with his claim that Mexican officers "were
operating under the explicit direction of the United States
government" or acting as "agents of the United States."  In
particular, he fails to articulate with any degree of specificity
how the allegedly violent conduct of Mexican officers in
effectuating his expulsion from Mexico, even if the expulsion had
been requested by the United States, can be attributed to the
"direction of United States officials."  Indeed, all of the
specific acts COURNOYER sets forth in his memorandum are ascribed

23

exclusively to *Mexican* officials, not officials of the United States.  The Second Circuit has established that the United States is not vicariously responsible for the actions taken by foreign officers when executing orders to detain or arrest at the request of the United States government.  See <u>Lira</u>, 515 F.2d at 71 ("[W]here the United States Government plays no direct or substantial role in the misconduct . . . the imposition of a penalty would only deter United States representatives from making a lawful request for the defendant and would not deter any illegal conduct.")

Moreover, COURNOYER has not pointed to a single communication between the United States and Mexico discussing COURNOYER's entry into Mexico and how he was to be treated by Mexican authorities, nor does he assert that he will be able to produce this evidence at a hearing.

The government expressly and unequivocally denies that it in any way counseled or directed officials from the Mexican government to kidnap, torture or physically harm the defendant. Moreover, the government was not even aware of the defendant's presence in Mexico until after he was detained by Mexican immigration authorities and denied entry into the country.  The defendant's bald allegations of U.S. involvement, without more, are insufficient to warrant an evidentiary hearing.  <u>See</u> <u>Toscanino</u>, 500 F.2d at 281 (remanding for an evidentiary hearing

24

with respect to Toscanino's allegations of forcible abduction "only if, in response to the government's denial, he offers some credible supporting evidence, including specifically evidence that the action was taken by or at the direction of United States officials. Upon his failure to make such an offer the district court may, in its discretion, decline to hold an evidentiary hearing.").

Moreover, even if a valid Toscanino claim could be made based upon the alleged actions of the Mexican police force, those actions do not rise to a level of outrageous conduct that would support dismissal under Toscanino. The Toscanino exception, if one still exists, has been recognized as applicable only in the most extreme circumstances. The Second Circuit has "made it clear that its recognition of an exception to the Ker-Frisbie rule is essentially limited to the extreme facts of Toscanino." United States v. Noorzai, 545 F. Supp. 2d 346, 352 (S.D.N.Y. 2008). See also United States v. Romano, 706 F.2d 370, 373 (2d Cir. 1983) (Toscanino is limited to "flagrant and illegal law enforcement practices"); United States v. Lira, 515 F.2d 68, 70 (2d Cir.), cert. denied, 423 U.S. 847 (1975) (Toscanino confined to situations where Government "secures the defendant's presence in the jurisdiction through use of cruel and inhuman conduct"). Thus, in the thirty plus years since Toscanino, "no court has ever applied Toscanino to dismiss an indictment." United States

v. Umeh, 762 F. Supp. 2d 658, 663 (S.D.N.Y. 2011), citing United
States v. Yunis, 681 F.Supp. 909, 919 (D.D.C.) (1988), rev'd on
other grounds, 859 F.2d 953 (D.C.Cir. 1988) (internal citation
removed).

      Courts have consistently rejected claims that treatment
allegedly suffered by a defendant reaches the "gross misconduct"
due process standard set forth by Toscanino.  See United States
v. Reed, 639 F.2d 896, 902 (2d Cir. 1981) (defendant enticed onto
airplane, forced to lie on the airplane floor at gunpoint, while
CIA agents threatened to "blow his brains out"); U.S. ex rel.
Lujan v. Gengler, 510 F.2d 62, 63 (2d Cir. 1975) (defendant lured
to Bolivia and held in prison for seven days); United States v.
Cordero, 668 F.2d 32, 37 (1st Cir. 1981) (defendant insulted,
pushed, slapped, forced to sleep on the floor and poorly fed
while in a Panamanian jail);  United States v. Yousef, 2011 WL
2899244 (S.D.N.Y. June 30, 2011) (defendant forced into car on a
dirt road by masked men in a pick-up truck carrying automatic
weapons who forced him to keep his head down during the trip);
United States v. Noorzai, 545 F. Supp. 2d 346, 352 (S.D.N.Y.
2008) aff'd in part, 422 F. App'x 54 (2d Cir. 2011) (defendant
lured to the United States by false promises that he would not be
arrested).  Thus, subsequent decisions have made it clear that
any recognition of an exception to the Ker-Frisbie rule is
essentially limited to the facts of Toscanino.

The treatment alleged by COURNOYER does not begin to
approach the standard set by the conduct alleged in Toscanino, in
which the defendant was forcibly abducted from his home in
Uruguay in view of his pregnant wife, knocked unconscious by six
members of the Uruguayan police force who were bribed by agents
of the U.S. government, forcibly smuggled over the border into
Brazil with a gun pointed at the back of his head, explicitly
threatened by his captors that he would be shot if he resisted,
and held in Brazil for seventeen days during which he was
incessantly tortured and interrogated with "metal pliers" and
"electrodes" attached to his "earlobes, toes, and genitals" that
"sent jolts of electricity . . . throughout his body, rendering
him unconscious for indeterminate periods of time" – all of
which occurred with the knowledge and even active participation
of agents of the U.S. Department of Justice.  Toscanino, 500 F.2d
at 270.

In contrast, COURNOYER was detained at an international
airport after being denied entry.  Such an occurrence does not
evoke a vision of a kidnaping.  He was detained at the airport by
immigration officials, who made themselves known to him
immediately.  COURNOYER argues his deprivation of water and food
while being held and that the roughly 30 hours he spent in
detention constitute gross mistreatment rising to the level of
torture.  However, much of the duration of his stay at the

27

airport and the treatment he faced during his expulsion are entirely of his own doing.

COURNOYER admits in his memorandum that only hours after his initial detention, he was provided with an airplane ticket to Canada (acceptance of which would have promptly ended detention).  He further admits that he himself refused to leave detention to board the flight, became extremely agitated, and had to be physically removed from the commercial terminal to prevent injury to airport staff, Mexican officials and bystanders.  COURNOYER also glosses over the fact that he refused to board two more commercial flights to Canada during his 36 hours of detention.   As such, the length of detention is directly attributable to the defendant's own actions.

Furthermore, the majority of COURNOYER's claims that "excessive force" was used in eventually getting him onto a plane do not "sink to a violation of due process" and are "little different from the circumstances of an ordinary arrest where officers may use a gun [and handcuffs] to make sure that the arrestee does not escape." United States v. Reed, 639 F.2d 896, 901-02 (2d Cir. 1981).  This is particularly true given the defendant's admission that he physically resisted expulsion from Mexico.  Even the most egregious of COURNOYER's allegations of misconduct fall considerably below the seventeen days of torture with metal pliers and electric shocks allegedly suffered by the

defendant in <u>Toscanino</u>.

In short, even if COURNOYER could establish the truth of his allegations, they would still fail to support dismissal of the indictment under <u>Toscanino</u>.

B.  **COURNOYER is Not Entitled to Dismissal of the Indictment, Repatriation to Canada or an Evidentiary Hearing on his <u>Fourth Amendment Claim</u>**

COURNOYER asserts that his Fourth Amendment rights were violated when excessive force was used against him during his detention in Mexico.  He asserts that this violation warrants the Court's dismissal of the indictment against him.  COURNOYER's Fourth Amendment claim should be dismissed because he lacks the standing to bring the claim.  Further, even if he did assert a sufficient and legally valid excessive force claim, he would not be entitled to dismissal of the indictment against him as a remedy.

1.  **The Fourth Amendment Does Not Apply to the Extraterritorial Seizure of a Foreign Citizen by <u>Agents of a Foreign Government</u>**

The Fourth Amendment protects against unreasonable searches and seizures by the US government, or by private persons acting as agents of the government.  It is a "well accepted principle of American law that the requirements of the Fourth Amendment do not apply to foreign searches by foreign officials." <u>United States v. Molina-Chacon</u>, 627 F. Supp. 1253, 1258 (E.D.N.Y. 1986).  Furthermore, even with United States officials are

29

involved, the Fourth Amendment is inapplicable to extraterritorial violations against persons who are not U.S. citizens and who have no voluntary attachment to the United States.  In United States v. Verdugo-Urquidez, the Supreme Court rejected a Fourth Amendment claim by a Mexican citizen searched on Mexican soil.  The Court reasoned:

> [T]the text of the Fourth Amendment, its history, and our cases discussing the application of the Constitution to aliens and extraterritorially require rejection of respondent's claim. At the time of the search, he was a citizen and resident of Mexico with no voluntary attachment to the United States, and the place searched was located in Mexico.  Under these circumstances, the Fourth Amendment has no application.

494 U.S. 259, 264, 274-275 (1990).  Thus, non-citizens who face brutality outside of the jurisdiction of the United States, particularly at the hands of non-US officials, cannot bring unreasonable search and seizure claims under the Fourth Amendment.

   2.   Dismissal of an Indictment is Not an Appropriate Legal
        Remedy For a Claim of Excessive Force in Violation of
        the Fourth Amendment

        Even if COURNOYER could prevail on his Fourth Amendment excessive force claim, his relief would not come in the form that he seeks.  As the Supreme Court explained in I.N.S. v. Lopez-Mendoza, 468 U.S. 1032, 1039 (1984), "[t]he 'body' or 'identity' of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or

30

interrogation occurred."  See also United States v. Crews, 445 U.S. 463, 474 (1980) ("Respondent is not himself a suppressible 'fruit,' and the illegality of his detention cannot deprive the Government of the opportunity to prove his guilt through the introduction of evidence wholly untainted by the police misconduct"); Gerstein v. Pugh, 420 U.S. 103, 119 (1975) ("[I]llegal arrest or detention does not void a subsequent conviction."); United States v. Blue, 384 U.S. 251, 255, 86 S.Ct. 1416, 1419, 16 L.Ed.2d 510 (1966) ("Our numerous precedents ordering the exclusion of . . . illegally obtained evidence assume implicitly that the remedy does not extend to barring the prosecution altogether.  So drastic a step might advance marginally some of the ends served by exclusionary rules, but it would also increase to an intolerable degree interference with the public interest in having the guilty brought to book.").

Thus, even if COURNOYER's excessive force claim were not factually and legally deficient, dismissal of the indictment is simply not an appropriate remedy.

For all of the foregoing reasons, COURNOYER's motion to dismiss the indictment and order his repatriation to Canada should be denied without the need for an evidentiary hearing.

<u>POINT TWO</u>

<u>COURNOYER'S MOTION TO TRANSFER VENUE</u>

A.   <u>Legal Standard</u>

    1.   <u>Rule 21(b) and the "Platt" Factors</u>

        Federal Rule of Criminal Procedure 21(b) provides:

> Upon the defendant's motion, the court <u>may</u> transfer the
> proceeding, or one or more counts, against that
> defendant to another district for the convenience of
> the parties, any victim, and the witnesses, and in the
> interest of justice.

F.R.Crim.P. 21(b) (emphasis added). The "disposition of a Rule

21(b) motion is vested in the sound discretion of the district

court." <u>United States v. Maldonado Rivera</u>, 922 F.2d 934, 966 (2d

Cir. 1990). In exercising that discretion, the Court routinely

considers the following non-exhaustive list of factors:

        (1)  location of the defendant;
        (2)  location of the witnesses;
        (3)  location of the events likely to be at issue;
        (4)  location of relevant documents and records;
        (5)  potential for disruption of the defendant's
             business;
        (6)  expense to be incurred by the parties;
        (7)  location of defense counsel;
        (8)  relative accessibility of the place of trial;
        (9)  docket condition of each potential district; and
        (10) other special circumstances that might bear on the
             desirability of transfer.

See <u>Platt v. Minnesota Mining & Manufacturing Co.</u>, 376 U.S. 240,

243-44 (1964) (listing and implicitly endorsing these factors);

<u>United States v. Maldonado-Rivera</u>, 922 F.2d at 966 (listing

factors).  No one factor is determinative; rather, the Court must

"try to strike a balance and determine which factors are of

greatest importance." <u>Maldonado-Rivera</u>, 922 F.2d at 966 (quoting <u>United States v. Stephenson</u>, 895 F.2d 867, 875 (2d Cir. 1990)). In doing so, a trial court "should not give any one factor more weight than any other and should base its decision on the quality of factors not the quantity of factors favoring one party." <u>United States v. Antia</u>, 1999 WL 294788, *1 (E.D.N.Y. Mar. 22, 1999) (Dearie, J.). Moreover, in this circuit, the Court of Appeals has tracked the language of Rule 21(b), by focusing on the effect of transfer on both parties, not just the defendant. <u>Stephenson</u>, 895 F.2d at 875 (considering the residences of government witnesses and the location of the prosecutor and evidence in finding that the district court did not abuse his discretion by denying a motion to transfer). A review of these factors, in the order they are identified in <u>Platt</u>, shows that the defendant has not met his burden of showing that he is entitled to a change of venue.

    2.    Venue is Presumed to be Proper in the District
             <u>Where a Prosecution is Brought</u>

As a general rule, criminal prosecutions should be retained in the districts in which they are originally brought. <u>United States v. Motz</u>, 652 F. Supp. 2d 284, 291 (E.D.N.Y. 2009) (Spatt, J.) (quoting <u>United States v. U.S. Steel Corp.</u>, 233 F. Supp. 154, 157 (S.D.N.Y. 1964) (Weinfeld, J.)). Thus, the moving defendant bears the burden of justifying the requested transfer.

United States v. Spy Factory, Inc., 951 F. Supp. 450, 464

(S.D.N.Y. 1997) (Sotomayor, J.).  To meet this burden, courts in

this circuit require the movant to show more than inconvenience

to himself and his business. See Antia, 1999 WL 294788, at *2

("It is also clear . . . that inconvenience to the defendant or

his business is not, by itself, a sufficient basis for a transfer

of venue."); United States v. Conner, 2001 WL 114314, *3

(S.D.N.Y. Feb. 9, 2001) (finding that while "defendants'

residence and place of work are important factors to consider,

they are not dispositive factors").  Indeed, in one often-quoted

opinion by Judge Weinfeld, a defendant's burden to justify a

transfer is characterized as follows:

> To warrant a transfer from the district where an
> indictment was properly returned it should appear that
> a trial there would be so unduly burdensome that
> fairness requires the transfer to another district of
> proper venue where a trial would be less burdensome;
> and, necessarily, any such determination must take into
> account any countervailing considerations which may
> militate against removal.

U.S. Steel Corp., 233 F. Supp. at 157 (emphasis added); see Motz,

652 F. Supp. 2d at 292 (quoting U.S. Steel Corp.).

    3.   Where Transfer of Venue Could Lead to Multiple Trials,
       the Principles Governing Joinder and Severance Apply

Where, as here, "a motion to transfer is made by fewer

than all defendants, it is appropriate to consider the

implications of that motion for the principles that govern the

34

joinder and severance of defendants in a single charging instrument." United States v. Thomas, 2006 WL 2283772, *2 (S.D.N.Y. Aug. 9, 2006). It is a well established presumption that defendants who are properly joined in an indictment should be tried together. Zafiro v. United States, 506 U.S. 534, 537 (1993). The effective severance of a single defendant's case from his co-defendants' by dint of a transfer, and the attendant cost in judicial, prosecutorial and witness resources must be considered in light of Rule 21(b)'s concern with the "convenience of the parties," not just the defendant, "and in the interest of justice." F.R.Crim.P. 21(b); United States v. Valdes, 2006 WL 738403, *8-11 (S.D.N.Y Mar. 21, 2006) (considering the government's interest in a joint trial as consistent with Rule 21(b)'s concern with both "convenience of the parties and witnesses," and "the interest of justice"). In addition, the government's interest in a single joint trial should be weighed by the Court as a "special element" along with the other Platt factors. Valdes, 2006 WL 738403, at *10; Thomas, 2006 WL 2283772, at *2 (noting that the effective severance of a moving defendant should be considered in the court's analysis of "special circumstances").

B.  COURNOYER Fails to Meet the Burden of Justifying a
    Transfer of His Case to the Northern District of New York

    1.  The Location of the Defendant and His Family
        Is Insufficient to Justify a Transfer of Venue

35

The defendant initially argues that transfer of this matter from the Eastern District of New York ("EDNY") to the Northern District of New York ("NDNY") is appropriate "based on the defendant's residence." (Def. Venue Mot. at 8). Yet as the defendant himself must concede, the Northern District is not now, nor has it ever been the defendant's place of residence. In fact, the defendant is not even a resident of the United States, but rather a Canadian resident.

Accordingly, the defendant's reliance on United States v. Ohran, 2000 WL 620217 (S.D.N.Y. May 12, 2000), United States v. Radley, 558 F. Supp.2d 865 (N.D.Ill 2008) and United States v. Gotti, 593 F.Supp.2d 1260 (M.D.Fla. 2008) is misplaced, as the defendants in those cases all resided in and had a substantial connection with the districts in which they sought to have their respective cases transferred. See United States v. Radley, 558 F. Supp 2d 865, 877 (N.D. Ill. 2008) (granting transfer to Houston for "Houston-based defendants and their families"); See also United States v. Gotti, 593 F. Supp. 2d at 1269 (granting transfer to the Southern District of New York in reliance of defendant, his family, and friends being "in and around New York"). In contrast, COURNOYER does not reside "in or around" the NDNY and has no substantial connection to the NDNY beyond the mere fact that he is alleged to have used that district's territory as a transit route for his drug smuggling business in

36

which he transported thousands of pounds of marijuana between
Canada and Brooklyn, New York.  Indeed, none of the defendants in
this case reside in the NDNY.  COURNOYER, Racine and Paisse are
all citizens and residents of Canada.  Taloni and Galebi reside
in the Central District of California.  Tashetti resides in the
Eastern District of New York, as did Castillo-Medina prior to his
arrest (although he is a citizen of Canada).

Moreover, COURNOYER is currently detained at the
Metropolitan Detention Center in Brooklyn, New York.  Thus, for
all intents and purposes, COURNOYER's "location" is the EDNY.
COURNOYER fails to provide any legal support for the proposition
that a Rule 21(b) transfer should be granted based on the
"residence" of an in-custody defendant.

In addition to this tenuous legal basis, COURNOYER's
motion also rests on the factually inaccurate premise that a
transfer to the NDNY would yield a trial in a courthouse "55
miles" from his home on the outskirts of Montreal, Canada.  See
Def. Venue Mot. at 9 ("The Northern District has courthouses as
close as fifty-five (55) miles from Montreal").  This argument
completely ignores the simple fact that every district judge in
the NDNY is based in Albany, Utica, Syracuse or Binghamton – all
of which are located at least 250 miles from Montreal.  Although
it is not articulated in his brief, COURNOYER's suggestion that
the NDNY has courthouses as close as 55 miles to Montreal appears

37

to be based on the assumption that a trial would take place in
Plattsburgh, New York.  However, there is no district court
located in Plattsburgh.  Indeed, as described on the official
website of the NDNY, "[t]he Plattsburgh Office is a satellite
office with limited public hours" and houses only a single part-
time magistrate judge.  See http://www.nynd.uscourts.gov  Since
even a full-time magistrate judge would be legally unable to
preside over a trial in this matter, COURNOYER's assumption is
grossly misplaced.  Given the actual locations in which a trial
would take place within the NDNY, COURNOYER's claim that the NDNY
is a substantially more convenient venue than the EDNY rings
hollow.

Finally, the defendant argues that his close
relationship to his family warrants transfer, as his family
mostly resides in Quebec, Canada.  This argument also fails.  The
mere desire to be close to family does not justify a transfer of
venue.  See United States v. Valdes, 2006 WL 738403 (noting that
while defendants' residence and family responsibilities in a
different district favored transfer, "Defendant's desires alone
are insufficient to warrant transfer").  In addition, the
defendant makes no showing that litigation in the Eastern
District as opposed to the Northern District would be
considerably more onerous for his family.  Indeed, as
demonstrated above, the location of the courthouses in the NDNY

38

would require COURNOYER's family to travel nearly as great a distance as a trip to the EDNY.[1]

The defendant also cannot show that his life and ability to maintain close connections with his family will be disrupted or inconvenienced to a significantly greater degree by a trial in the Eastern District than it would be by a trial in the Northern District.  With respect to the burden of the trial itself, courts have repeatedly emphasized that inconvenience is simply a reality of any federal criminal trial regardless of venue.  For example, in United States v. Rubin/Chambers, 2011 WL 102695 (S.D.N.Y. Jan. 3, 2011), the district judge denied a transfer of venue motion, noting:

> [W]hile the Court is not unsympathetic to the burden that Rubin may face in being separated from his family, the Court must also recognize that, given the realities and exigencies associated with any trial, Rubin will not likely be available to provide his current level of support for his wife or family regardless of where the trial is held.

Id., at *2.  Similarly in United States v. Wilson, 2001 WL 798018

---

[1] Nor is distance alone indicative of the relative burden imposed by such travel.  A typical commercial airline flight from Montreal, Canada to John F. Kennedy International Airport in Queens, New York involves a travel time of approximately 1 hour and 35 minutes – hardly a profound hardship, particularly when considered against the relative scarcity of direct flights between Montreal and Albany, Syracuse, Utica or Binghamton.

(S.D.N.Y. July 13, 2001), the district judge wrote:

> Every life is significantly disrupted during a trial
> wherever it is held. Besides the need to be in court
> every day, the evenings and weekends are usually
> consumed analyzing the evidence that has been admitted
> and preparing for the remainder of the trial.

Id., at *3 (conditionally denying motion to transfer venue).  See
also United States v. Antia, 1999 WL 294788, *2 ("Antia will of
course have to take time off from work to attend his trial
whether the trial takes place in California or New York.").  A
distance which may be traversed in less time than the daily
commute of many residents of the New York Metropolitan area is
hardly the type of extraordinary additional hardship that would
justify a transfer under Rule 21(b).

In sum, this factor lends no support to the defendant's
motion for transfer.

2.   The Location of Potential Witnesses is
     Insufficient to Justify a Transfer of Venue

To establish that the location of potential witnesses
supports transfer, a defendant bears the burden of identifying
the witnesses that he expects to call at trial and explaining why
his witnesses would be unable to testify in the Eastern District.
See United States v. Guastella, 90 F. Supp. 2d 335 at 399
(S.D.N.Y. 2000); Spy Factory, 951 F. Supp. at 457.  The "naked
allegation that witnesses will be inconvenienced by a trial in a
distant forum will not suffice for transfer;'" rather, a
defendant "'must offer specific examples of witnesses' testimony

40

and their inability to testify because of the location of the
trial'" and "'the court must rely on concrete demonstrations of
the proposed testimony.'" Spy Factory, 951 F. Supp. at 456
(quoting United States v. Haley, 504 F. Supp. 1124, 1126 (E.D.
Pa. 1981) (internal quotation marks omitted)); see also United
States v. Juncal, 1998 WL 4739389, at *5 (S.D.N.Y. Aug 7, 1998)
(holding that without a specific proffer of the testimony of
prospective defense witnesses, "there is no basis to grant the
motion to transfer").

        The defendant has utterly failed to meet this burden.
First, the defendant has given no specific information regarding
the identity, residences or expected testimony of witness, and
makes no allegation that any of these purported witnesses would
be unable or unwilling to travel to the EDNY to testify.  The
defendant's motion contains only a bare assertion that he will
likely have witnesses of Canadian nationality and that trial in
the Eastern District will result in a "virtual migration of
witnesses from Canada." (Br. 10).  With absolutely no description
of who these purported witnesses are or what possible relevance
their testimony would have, this factor lends virtually no
support to COURNOYER's motion.  See United States v. Bankas, 2005
WL 2205340, at *6 (W.D. Wis. Sept. 8, 2005) ("weight of this
factor is undermined" by the defendant's failure to identify his
character witnesses).

Even if the defendant does intend to call witnesses residing in Canada (and the witnesses actually possess relevant and admissible evidence), the defendant fails to establish "their inability to testify because of the location of the trial." Spy Factory, 951 F. Supp. at 456.  Nor does COURNOYER even attempt to explain how a transfer to the Northern District will alleviate the inconvenience of having these international witnesses travel to the United States for trial.

Finally, although the government has not finalized its witness list, the location of witnesses the government might call at trial covers multiple jurisdictions, including the Central District of California, the Southern District of Florida, the Northern District of New York and different locations within Canada.  The majority of the government's likely witnesses, however, currently reside in or near the Eastern District of New York.  Thus, the convenience of witnesses provides little justification for transfer to the NDNY.  Indeed, since the EDNY is home to two large international airports that offer daily, direct flights to and from all major cities in the United States and in Canada, the EDNY would be a far more convenient venue for most, if not all of the anticipated witnesses.

3.   The Events at Issue are Do Not Favor Transfer
     to the Northern District of New York

The defendant is charged with orchestrating and arranging for thousands of pounds of exotic marijuana to be

42

imported into the United States from Canada and transported to
the Eastern District, where it was stored and distributed out of
stash houses located in Brooklyn and Queens, New York.  The
proceeds from the sale of the marijuana was collected and hidden
in Brooklyn, New York.  Upon collection, the marijuana proceeds
were then either laundered back to Canada to fund the delivery of
more marijuana to the EDNY or sent to California to purchase
cocaine, which was then smuggled into Canada.  Accordingly, since
the center of gravity for a majority of the charged criminal
activity is the Eastern District of New York, this factor
strongly supports retaining venue in this district.  See United
States v. Carey, 152 F. Supp. 2d 415, 422 (S.D.N.Y. 2001)
(denying motion to transfer and noting that "as to 'the events
which will be in question,' the genuine 'center of gravity'
appears to be in this district"; citation omitted); contrast with
United States v. Hanley, 1995 WL 60019, *3 (S.D.N.Y Feb. 10,
1995) ("Where, as here, the 'nerve center' of events in issue
occurred in another district, transfer has been found
appropriate.").

        The defendant argues, and the government does not
dispute, that significant events occurred in Quebec, Canada,
where the defendant presided over his marijuana smuggling
operation.  However, despite the fact that the defendant directed
his co-conspirators from Canada, it cannot be disputed that a

43

majority of the substantive violations with which he is charged in the indictment occurred in the Eastern District. See United States v. Aronoff, 463 F. Supp. 454, 459 (S.D.N.Y. 1978) (denying motion for transfer finding that direction from Michigan "by mails or a telephone" of criminal acts done in New York to be "immaterial").  Moreover, defendant's argument is fundamentally flawed in that it appears to equate criminal conduct in Canada with a need to transfer venue to the Northern District; no such connection exists.  Defendant's premise would result in the absurd practice of transferring every case involving an international defendant to a random district that happens to be closest to the international defendant's country of origin.  A criminal indictment against a Mexican cartel leader does not require automatic transfer to Texas simply because that state happens to be closer to the defendant's base of operations in Guadalajara.  Likewise, the defendant's reign over a Canadian-based criminal enterprise provides no basis for transferring this matter to the Northern District of New York simply because that district happens to be closer to Canada than the Eastern District.[2]

Finally, while the defendant claims that the Northern

_____

[2] Notably, the District of Vermont (headquartered in Burlington, VT) is actually 150 miles closer to Montreal than any of the Northern District courthouses.

District played an important part in this scheme (Def. Venue Mot. at 13), none of the events that are likely to be at issue during a trial in this matter occurred in the Northern District. None of the defendants are charged with personally committing any criminal acts in the Northern District. The Northern District merely served as a conduit through which the defendant's marijuana traveled en route to its final destination -- the Eastern District. The success and profitability of the defendant's scheme relied on the events which occurred in the Eastern District of New York (the distribution and sale of marijuana), the Central District of California (the purchase of cocaine for export to Canada) and Canada (where the defendant directed the activities of his narcotics enterprise and received its lucrative profits).

Accordingly, the defendant has not come close to demonstrating that this factor supports a transfer to the NDNY.

4. The Location of Physical Evidence Does Not
    Justify a Transfer of Venue

The location of physical evidence does not favor a transfer to the Northern District. It is well settled that "given the conveniences of modern transportation and communication," this fourth Platt factor is given little weight relative to the other nine. United States v. Martino, No. 00 Cr. 389, 2000 WL 1843233, at *5 (S.D.N.Y. Dec. 14, 2000); United

45

<u>States v. Coriaty</u>, No. 99 Cr. 1251, 2000 WL 1099920, at *3
(S.D.N.Y. 2000)(location of relevant documents is "of little
consequence one way or the other").  As such, courts in this
district have recognized that the fourth Platt factor is not as
influential today as in the past. <u>See</u>, <u>e.g.</u>, <u>Spy Factory</u>, 951 F.
Supp. At 458 ("Even where the Government has five file drawers of
documents, the location of documents and records is not a major
concern in these days of easy and rapid transportation.").  When
the documents to be used by both parties are located in multiple
jurisdictions, such as in this instance, courts in this circuit
have considered this factor to favor neither side.  <u>See</u> <u>Valdes</u>,
2006 WL 738406 at *6; <u>see also</u> <u>United States v. Russell</u>, 582 F.
Supp. 660, 663 (S.D.N.Y. 1984) (holding fourth <u>Platt</u> factor
irrelevant when documents are in both Tennessee and in New York).

     While the government acknowledges that this is not a
particularly important factor, virtually all of the documentary
evidence the government intends to introduce at trial was seized
either in the Eastern District of New York or the Northern
District of California.  This documentary evidence is now
presently located at the United States Attorney's Office in
Brooklyn, New York.  More importantly, the physical evidence
(including nearly 50 kilograms of cocaine, multiple samples from
seized shipments of marijuana and dozens of seized electronic
devices) are currently maintained in secure DEA evidence vaults

46

in the Eastern District.  Transportation of such items to the Northern District would be far more inconvenient than the deliver of documents alone, which can be stored and transmitted electronically.

As a result, this factor does not weigh in favor of transfer.

5.   The Disruption of the Defendant's Business is Irrelevant and Inevitable

The defendant alleges that his incarceration in the Eastern District prohibits him from performing his alleged "necessary job functions". (Def. Venue Mot. at 14).  However, the defendant fails to demonstrate how transfer to, and further incarceration in, the Northern District will solve this problem.  These unspecified alleged harms to the defendant's job performance are the consequences of indictment, not the location of the prosecution.  Any disruption to the defendant's efforts to work or manage property in Canada will occur no matter where the trial occurs. See, e.g., Spy Factory, 951 F. Supp. at 458 ("inconvenience and interference with normal occupational activities occur whenever a defendant is involved in a trial facing serious charges"); United States v. U.S. Steel Corp., 233 F. Supp. 154, 157 (S.D.N.Y. 1964).  To establish that this factor weighs in favor of transfer, the defendant must show that the disruption would be substantially less if the case were

adjudicated in an alternate district. See United States v. Layne, 2005 WL 1009765, at *5 (S.D.N.Y. May 2, 2005). Accordingly, given the defendant's failure to establish that a trial in the Northern District would be less disruptive to his job performance than one in the Eastern District, this factor adds no weight to the defendant's motion.

6.   The Expenses to Be Incurred by the
     Parties Do Not Warrant Transfer

In analyzing this factor, the Court must give consideration to both the expense to the defendant if the trial were in the Eastern District, as well as the expense to the government to try the case in an alternative forum. See Guastella, 90 F. Supp. 2d at 340-341; see also, United States v. Stephenson, 895 F. 2d, at 875 (citing the location of the prosecutor as a factor in upholding the denial of a Rule 21(b) motion).

Here, any expenses related to the defendant's family and legal services will be borne regardless of where the trial is held in the state of New York. Although the defendant emphasizes that his defense requires "extensive legal work in both the United States and Canada" (Def. Venue Mot. at 15), this expense will be required if the trial is held in the Eastern District or the Northern District. In addition, the defendant baldly alleges with no specificity that the costs of travel, board, and

48

accommodations are "increased exponentially" by the location in the Eastern District as opposed to the Northern District. Although the government does not foresee any additional expense for the defendant if the case remains in the Eastern District, even assuming that the defendant would incur additional expenses if this case remains in this district, the government would likewise incur substantial expense if the case was transferred from the Eastern District.[3]

Transfer to the Northern District would more heavily burden the Government and would merely serve "to shift the [defendant's] economic burden to the government." United States v. Carey, 152 F.Supp. 2d 415, 422-34 (S.D.N.Y. 2001) (finding this factor to be neutral).  The expense to the government if the case is transferred would include relocation of its entire prosecution team (presently three Assistant U.S. Attorneys in the

_____

[3]      For this factor to weigh in favor of transfer, a defendant must generally show that he has insufficient funds to provide for his defense if the case is not transferred.  See Valdes, 2006 WL 738403, at *7; United States v. Culoso, 461 F.Supp 128, 136 n. 12 (S.D.N.Y. 1978); see also United States v. Ferguson, 432 F. Supp. 2d 559, 567 (E.D. Va. 2006) ("Courts considering this factor are not to focus on the size of an expense that the defendants may incur, but rather, on their ability to pay.").  While the defendant has asserted that a trial in this district will cause increased expenses, he has not provided a factual basis in support of that claim.  Because the defendant has not established that he has insufficient funds to proceed to trial in this case absent a transfer, the Court should conclude that this factor weighs against transfer.

Criminal Division, one Assistant U.S. Attorney in the Civil Division, two agents, and one paralegal) from Brooklyn, New York to an unspecified location in the Northern District.  The government would also incur the expense of relocating physical evidence that it has gathered in this District.  Additionally, the expense of severing defendant COURNOYER from the remaining defendants in the Eastern District strongly counsels against transfer to the Northern District. See United States v. Klein, 429 F. Supp. 2d 633, 646 (S.D.N.Y. 2006) ("[T]he circumstances here weigh against transfer, including the potential for multiple trials in multiple districts, which would cause great inconvenience to witnesses, considerable additional expense to the government, duplication of court time and effort, and the risk of inconsistent results.").

    7.    The Location of Defense Counsel
           Favors the Eastern District of New York

The defendant retained counsel in this case prior to his initial appearance in the Eastern District.  The defendant's retained counsel's office is located in the Eastern District.  Indeed, the offices of every attorney of record in this matter are in the Eastern District of New York or just across the bridge in Manhattan.

In an argument bordering on the absurd, COURNOYER suggests that the Court should ignore the incontrovertible fact

that every attorney in the case maintains offices in or near the
Eastern District, and instead decide that this factor supports
transfer to the Northern District of New York because he has
retained the services of an unidentified "French-speaking
attorney in Montreal."  (Def. Venue Mot. at 16).  Since COURNOYER
already has two able New York attorneys that have filed notices
of appearance, represented him for several months, presumably
familiarized themselves with this case and filed a myriad of
motions on his behalf, it is unclear what, if any, role
COURNOYER's purported "Canadian Attorney" will perform in this
matter.  Given that this mystery counsel has not seen fit to file
a notice of appearance or participate in any of the substantial
pretrial litigation that has already taken place over the six
months that the case has been pending, there is no basis to
conclude that the convenience of this attorney should even be
considered by the Court in evaluating the merits of COURNOYER's
transfer motion.  Indeed, since COURNOYER has failed to provide
any information about the attorney (even his or her name), it is
unknown whether this attorney is even licensed to practice in the
United States (or is even a criminal defense attorney for that
matter).

Neither the defendant's counsel in Canada nor his
retained counsel in the Eastern District have any alleged
connection to the Northern District.  Yet, the defense suggests

that since the Northern District is a physical half-way point between the location of these two attorneys' offices, this <u>Platt</u> factor favors transfer to the Northern District.  This suggestion is baseless.  Certainly the defense would not claim that a party who maintains counsel in both California and New York is best served to litigate in Kansas – a half-way point between New York and California.   This factor therefore clearly favors the continued prosecution of this case in the Eastern District.

      8.   <u>The Eastern District of New York is Readily Accessible</u>

While conceding, as he must, that the Eastern District is accessible by "automobile, air, and public transit." (Def. Venue Mot. at 17), COURNOYER contends that this factor nonetheless supports transfer "because of the relative distance of the Eastern District from all of the interested parties and events." (<u>Id</u>.).  As discussed above, however, COURNOYER's characterization of the actual distances involved is grossly misleading.  Moreover, the proximity of the Brooklyn courthouse to John F. Kennedy International Airport and LaGuardia Airport makes it readily accessible to any of the defendant's witnesses and supporters who will be traveling internationally.  Indeed, given the frequency of flights connecting the New York metropolitan area to major transportation hubs around the world, including Montreal, the EDNY is far more accessible and convenient for all of the witnesses who are expected to travel

internationally or cross-country in order to attend the trial than courthouses in the NDNY.

Thus, this factor adds no support to COURNOYER's motion for a transfer.

9. The Comparative Docket Conditions in the Current and Requested District Do Not Favor Transfer

The statistics cited by the defendant regarding relative case loads in the current and requested districts are largely irrelevant as this is a complex case, no party has requested a trial date, and the Court is able to set its own schedule. Also, the defendant's statistics consist of stand-alone numbers representing the amount of criminal and civil cases filed in the Eastern and Northern Districts. These numbers alone give the appearance that the Eastern District's docket is overloaded compared to the Northern District's. However, the defendant fails to add crucial information regarding the relative case loads. The Eastern District has twenty-six active judges compared to nine in the Northern District, therefore substantially alleviating any alleged "burden." Also, a new judge in the Northern District would need time to clear his or her docket for this trial and become familiar with this case, causing further delay. Moreover, the defendant has made no showing that this Court will be unable to try this case in a timely manner. As a result, the defendant has not established

53

that this factor weights in favor of transfer.

     10.  <u>No Special Elements Favor Transfer</u>

        The defendant fails to show that any special elements favor transfer from the Eastern District to the Northern District.  As an initial matter, the defendant claims that the United States is a country entirely foreign to him, as he is a native Canadian.  However, the defendant has not shown how transfer to a neighboring district within the state of New York addresses this discomfort.  As stated above, there are many locations within the Northern District, most of which are not any closer to the defendant's family.  Moreover, the defendant's claim that, while in the Eastern District, he is facing a life sentence without the "immediate and tangible moral support of his family" is unsubstantiated. (Def. Venue Mot. at 18).  The Eastern District is easily accessible by car and plane.  Moreover, the defendant will only be located within the Eastern District until the completion of his case.  At that time, if convicted, he can request that this Court recommend incarceration at a federal prison close to the Canadian border.  Courts have sympathy for the hardship caused by trial but recognize such hardship are an inevitable component of the process. <u>See</u> <u>United States v. Wilson</u>, 2001 WL 798018 at *3 (conditionally denying motion to transfer venue noting that "every life is significantly disrupted by a trial wherever it is held").  Even if the defendant's claims of

54

mental anguish are credible, the defendant has failed to demonstrate how these problems will be substantially alleviated by a transfer to the Northern District.

> 11. Severance of the Defendant's Trial from His Co-Defendants Would Pose a Considerable Hardship on the <u>Government, its Witnesses and the Judicial System</u>

Rule 21(b) requires a court to consider not only the defendant's convenience, but the "convenience of witnesses and parties" as well as "the interest of justice." F.R.Crim.P. 21(b). Severance of a single defendant who is properly joined in a multi-defendant case is contrary to the government's interest in avoiding duplicate trials and is inconvenient for the prosecution team and witnesses based in and near the original district. The government's interest in a joint trial is therefore a "special element" for the court's consideration. <u>See</u> <u>United States v. Valdes</u>, 2006 WL 738403, *8-11 (S.D.N.Y Mar. 21, 2006)(finding that "the Government's interest in a joint trial is appropriately weighed as a 'special element' along with the other <u>Platt</u> factors").

In this case, the assigned Assistant U.S. Attorneys and case agents are based in the EDNY. <u>See</u> <u>United States v.</u> <u>Quattrone</u>, 277 F. Supp. 2d 278, 279-80 (S.D.N.Y. 2003)(denying motion to transfer and taking into account that the indictment "was put together in all its detail by a staff of lawyers in this

district and thereafter returned [by a grand jury] in this district"). Moreover, because the defendant is the leader of this drug smuggling and money laundering organization, and charged in every count in the indictment, the proof against the defendant requires the government to present a full narrative of his organization. Thus unlike certain multi-defendant cases where a motion to transfer has been granted, there is no easy way to divide the trial witnesses and evidence for presentation in two separate fora. Compare with Valdes, 2006 WL 73403, at *12-13 (granting transfer of defendants charged with money laundering, effectively severing them from defendants charged with narcotics trafficking).

Moreover, this district is the locus of the federal prosecution arising from the offenses outlined in the indictment. Indeed, this Court has been presiding over a related case charging members of this narcotics and money laundering conspiracy. As a result of the related case, this Court has already developed an extensive familiarity with the complex narcotics and money laundering scheme at the heart of this case that is not shared by any of the judged in the Northern District.

Finally, retention of the case against this defendant in this district will obviate the possibility of inconsistent legal rulings on issues that are common to this case. This is an important factor weighing in favor of retaining venue in the EDNY

56

over the entire case.  See United States v. Stein, 429 F. Supp. 2d 633, 645-46 (S.D.N.Y. 2006) (concluding that the risk of inconsistent verdicts weighed against transfer).  Accordingly, concerns of judicial economy and consistency are an additional factor weighing against transfer in this case.

In sum, the defendant has failed to meet his burden of demonstrating that a trial in the Eastern District of New York would be so unduly burdensome that fundamental fairness requires the transfer of this case to the Northern District of New York.

<u>POINT THREE</u>

<u>COURNOYER'S MOTION FOR SEVERANCE</u>

By motion dated May 31, 2012, COURNOYER moved to sever his trial from that of his co-defendants.  In support of his motion, COURNOYER argues that severance is proper because (a) the jury would not be able to make a reliable judgment about his guilt or innocence because he would be substantially prejudiced by evidence admitted against his co-defendants, and (b) his defense is mutually exclusive from the defenses of his co-defendants.  (Def. Severance Mot. at 2-4).  As set forth below, COURNOYER's motion should be denied in its entirety as it is completely without merit.

A.   <u>Legal Standard for Severance</u>

1.   General Principals: Jointly Charged
     <u>Defendants Should be Jointly Tried</u>

57

Federal Rule of Criminal Procedure 8(b) provides for joinder of defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). Under the Rule, "a non-frivolous conspiracy charge is sufficient to support joinder of defendants." United States v. Nerlinger, 862 F.2d 967, 973 (2d Cir. 1988). The Second Circuit has interpreted the language of Rule 8(b) to mean that defendants may be joined if they are alleged to have committed acts "arising out of a common plan or scheme" or acts that are "unified by some substantial identity of facts or participants." United States v. Ashley, 905 F. Supp. 1146, 1164 (E.D.N.Y. 1995) (citing United States v. Attanasio, 870 F.2d 809, 815 (2d Cir. 1989); see also, e.g., United States v. Schlesinger, 360 F.Supp.2d 512 (E.D.N.Y. 2005); United States v. Allamon, No. 04 CR 1231 (JSR), 2005 WL 2542905 (S.D.N.Y. Oct. 11, 2005). See also United States v. Turoff, 853 F.2d 1037, 1044 (2d Cir. 1988) (joinder proper where proof of one distinct scheme is indispensible for a full understanding of the other).

"There is a preference in the federal system for joint trials of defendants who are indicted together." Zafiro v. United States, 506 U.S. 534, 537 (1993); see also United States v. Bernstein, 533 F. 2d 775, 789 (2d Cir. 1976). The presumption in favor of joint trials is particularly strong when the crimes

58

charged involve "a common plan or scheme and defendants have been jointly indicted." United States v. Cardascia, 951 F.2d 474, 482 (2d Cir. 1991). This strong preference reflects several principles, as the Supreme Court has forcefully stated:

> It would impair both the efficiency and the fairness of the criminal justice system to require . . . that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability - advantages which sometimes operate to the defendant's benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.

Richardson v. Marsh, 481 U.S. 200, 210 (1987). Thus, while joint trials may invite some prejudice to defendants, "[t]he risks of prejudice attendant in a joint trial are presumptively outweighed by the conservation of time, money and scarce judicial resources that a joint trial permits." United States v. Jimenez, 824 F. Supp. 351, 366 (S.D.N.Y. 1993).

In recognition of the compelling interests served by joint trials, it is well-established that severance motions "are committed to the sound discretion of the trial judge." United States v. Casamento, 887 F. 2d 1141, 1149 (2d Cir. 1989), cert. denied, 439 U.S. 1081 (1990); United States v. Torres, 901 F. 2d 205, 230 (2d Cir.), cert. denied, 498 U.S. 906 (1990). However, "in exercising this discretion, the Court must pay head to the

powerful institutional interests in judicial economy favoring joint rather than separate trials." United States v. Henry, 861 F. Supp. 1190, 1199 (S.D.N.Y. 1994).  For example, consideration of "the burdens upon the criminal justice system imposed by separate trials has given rise to a strong presumption in favor [of] joint trials and led courts to erect high barriers to defendants who move for severance." Id. (emphasis added).

> ## 2.   Defendant Must Show Severe Prejudice or Violation of a Specific Right in Order to Warrant Severance

District courts should grant a severance under Rule 14 only if "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 539.  As the cases in this circuit have made clear, severance is not warranted unless the denial of such relief would so severely prejudice a defendant that he could not obtain a constitutionally fair trial.  See, e.g., United States v. Locascio, 6 F.3d 924, 947 (2d Cir. 1993), cert. denied, 114 S.Ct. 1465 (1994); United States v. Lasanta, 978 F.2d 1300, 1306 (2d Cir. 1992) (citing United States v. Cervone, 907 F.2d 332, 341 (2d Cir. 1990), cert. denied, 498 U.S. 1028 (1991)); United States v. Tutino, 883 F.2d 1125, 1130-31 (2d Cir. 1989), cert. denied, 493 U.S. 1081 (1990).  Defendants do not meet this burden "merely because they may have a better chance of acquittal in separate trials." Zafiro, 506 U.S. at 540;

United States v. Carson, 702 F. 2d 351, 366 (2d Cir.) ("That the
defendant would have had a better chance of acquittal at a
separate trial does not constitute substantial prejudice."),
cert. denied, 462 U.S. 1108 (1983).  In this circuit, to warrant
severance the defendant must show that prejudice from a joint
trial "is sufficiently severe to outweigh the judicial economy
that would be realized by avoiding multiple lengthy trials."
United States v. Walker, 142 F.3d 103, 110 (2d Cir. 1998).
Accordingly, where there is a risk of prejudice, "the tailoring
of the relief to be granted, if any, is left to the district
court's sound discretion."  Id. at 937-38; United States v.
Harwood, 998 F.2d 91, 95 (2d Cir.), cert. denied, 114 S.Ct. 456
(1993).  Even when the risk of prejudice from conflicting
defenses is substantial, "less drastic measures [than severance],
such as limiting instructions, often will suffice to cure any
risk of prejudice."  Id.  Juries are presumed to follow such
curative instructions.  Id. (citing Richardson v. Marsh, 481 U.S.
at 211).

B.    Compelling Interests Mandate a Single Joint Trial

        The normal presumption for joint trials applies with
particular force in this case.  First, is the issue of "judicial
economy," which is "the primary factor to be considered by the
district court in the exercise of [its] discretion".  Jimenez,
824 F. Supp. at 366; United States v. Morrow, 537 F.2d 120, 136

61

(5th Cir. 1976) ("Once the Government has satisfactorily
established the existence of the conspiracy, the same evidence
used to convict a particular defendant is admissible against all
co-defendants shown to be members of the conspiracy.  Given this
state of affairs, the interest in judicial economy understandably
exerts strong pressures in favor of a joint trial."), cert.
denied, 430 U.S. 956 (1977).

          In the instant case, COURNOYER and his co-defendants
are charged with engaging in four narcotics conspiracies and a
money-laundering conspiracy, which spanned a period of nine
years.  Requiring separate trials to prove the existence of the
same conspiracies would be grossly inefficient.  This Court has
designated this matter as a complex case, and the government
expects that a trial in this case will take approximately one
month.

          Further, due to the nature of the charged conspiracy,
the proof against COURNOYER is inextricably intertwined with that
of his co-defendants.  Each co-defendant had a necessary role and
was a crucial link in the effectiveness and success of the
narcotics and money laundering conspiracies.  Efficiency begs a
joint trial to facilitate a proper and non-duplicative
presentation of the structure of the conspiracy and each
defendant's role as a co-conspirator.  See United States v.
Milan, 834 F. Supp. 78, 81 (S.D.N.Y. 1993).  Moreover, a majority

of the witnesses who the government anticipates calling to testify against COURNOYER will also testify against his co-defendants.  Thus, severing COURNOYER from the case would result in two virtually identical trials.  See id. at 81 (finding that where "the same body of evidence is admissible against . . . defendants, a severance would result in several lengthy and duplicative trials" and "a waste of judicial and law enforcement resources").  In addition to the inefficiency of producing substantially the same evidence and witnesses, the process of selecting two separate juries would also increase the total time required to try the defendants.  See United States v. Gambino, 729 F. Supp. 954, 970 n.18 (S.D.N.Y.) ("Jury selection alone in cases of this type can be prolonged and thus add greatly to the time spent on separate trials."), rev'd in part on other ground, 920 F. 2d 1108 (2d Cir. 1990), cert. denied, 502 U.S. 810 (1991).

Finally, a single trial of the charges will best avoid the "scandal and inequity of inconsistent verdicts." Richardson v. Marsh, 481 U.S. at 210.  By presenting the complete picture of the circular scheme to the jury, there is a greater likelihood that justice will be accomplished. Id.; Milan, 834 F. Supp. at 81 ("the present case involves a cohesive heroin distribution organization whose operation, while encompassing many participants, can be readily and best understood by a single jury"); United States v. Badalamenti, 662 F. Supp. 1542, 1545

63

(S.D.N.Y. 1987) ("It was only by putting together the voluminous results of such continuous surveillance that the circumstantial evidence fitted together like a crossword puzzle to show that the defendants were involved in a large-scale international conspiracy to import drugs") aff'd sub. nom., <u>United States v. Casamento</u>, 887 F. 2d 1141.  Given the economic waste caused by severance and the judicial interest in presenting the conspiracy to one informed jury, the circumstances favor a joint trial.

C.   COURNOYER Has Failed to Show Severe Prejudice <u>or the Violation of Specific Rights From a Joint Trial</u>

   1.   COURNOYER Will Not Suffer Spillover Prejudice From a <u>Joint Trial</u>

      In support of his motion for severance, COURNOYER argues that evidence establishing the culpability of his co-defendants will result in spillover prejudice. (Def.'s Mot. at 3-4).  Specifically, he asserts that "discovery materials have suggested that Mr. COURNOYER's co-defendants, some of which he has never even met, were partaking in activities completely independent from the offenses alleged in the indictment."  (Id. at 4).  Further, COURNOYER points out that some of the surveillance photographs and video recordings turned over in discovery were "both geographically and conceptually distant from the alleged criminal activities of Mr. COURNOYER."  (Id.). Finally, COURNOYER argues that photographs of marijuana and cash seizures taken pursuant to his co-defendants' arrests would

"undoubtedly inflame the jury and make it difficult for them to conceptualize the differences between the offenses." (Id.). Many of the arguments put forth by COURNOYER are irrelevant, and all of them are without merit.

The most common basis on which severance is sought is prejudicial spillover. This circuit has found prejudicial spillover to occur when "evidence admissible against only one defendant is prejudicial to all defendants and that individual trials should have been held to avoid that prejudice." United States v. DiNome, 954 F.2d 839, 843 (2d Cir. 1992); see also United States v. Salameh, 152 F.3d 88, 115 (2d Cir. 1998) ("'Prejudice' occurs in joint trials when proof inadmissible against a defendant becomes a part of his trial solely due to the presence of co-defendants as to whom admission is proper."). The Second Circuit has held that when multiple defendants are charged in a conspiracy, spillover prejudice is relevant to a severance analysis only where that evidence could not be admitted against a defendant if he were to have been tried separately. See United States v. Miller, 116 F.3d 641, 679 (2d Cir. 1997).

The nature of conspiracy trials often require the government to produce much of the same evidence to prove the existence and scope of the conspiracy, and therefore, defendants charged with conspiracy violations who seek severance bear an "extremely heavy burden." United States v. Vanwort, 887 F.2d

65

375, 384 (2d Cir. 1989) (quoting United States v. Friedman, 854 F.2d 535, 563 (2d Cir. 1988), cert. denied, 490 U.S. 1004, 104 L. Ed. 2d 153, 109 S. Ct. 1637 (1989)) (internal quotation marks omitted), cert. denied, 495 U.S. 906, 109 L. Ed. 2d 290, 110 S. Ct. 1927 (1990); see also United States v. Muyet, 945 F. Supp. 586, 596 (S.D.N.Y. 1996) ("[C]laims of prejudicial spillover rarely succeed, particularly where the defendant advancing the claim is charged along with other defendants in a narcotics conspiracy.") (citing United States v. Gambino, 809 F. Supp. at 1074 (S.D.N.Y. 1992); United States v. Rahman, 854 F. Supp. 254, 264 (S.D.N.Y. 1994) ("There is no risk of prejudice where much of the evidence pointed to by defendants would be admissible in separate trials against each defendant, because evidence of the full nature and scope of the conspiracy is admissible, even at the trial of lesser participants.").

Here, COURNOYER was the leader and organizer of a drug and money laundering organization which he lead from his home base in Canada. Significantly, five of the seven counts for which COURNOYER has been indicted are conspiracies involving either narcotics or money laundering. Notably, COURNOYER and all of his co-defendants are charged in the money laundering conspiracy, and all but one co-defendant is charged in at least two of the narcotics conspiracies. While COURNOYER argues that he was "geographically and conceptually distant from" the alleged

criminal activity, he stops short of arguing that evidence of the
narcotics conspiracies is inadmissible against him.  Since
COURNOYER is alleged to be the leader of the charged criminal
enterprise, it is difficult to fathom how evidence of the
criminal activities engaged in by his underlings would be
inadmissible against him.  Moreover, COURNOYER's spatial distance
from certain phone calls, photographs, and seizures is wholly
irrelevant so long as he conspired to commit the offenses
charged.  See United States v. Chavez, 549 F.3d 119, 126-128 (2d
Cir. 2008) (affirming the conviction of Chavez as leader of a
narcotics conspiracy even though he resided in California and the
organization's primary distribution operation was based in New
York).

        During the trial in this case, the government
anticipates testimony from several cooperating witnesses who
either worked directly with COURNOYER or for a co-conspirator who
worked directly with COURNOYER.  These cooperating witnesses will
testify, in sum and substance, that COURNOYER arranged for large
shipments of marijuana to be imported from Canada into the United
States; that these shipments were received in Brooklyn and
Queens, New York, where they were distributed; that the proceeds
from the sale and distribution of the marijuana were sent to
California; and that certain proceeds from COURNOYER's marijuana
trafficking operation were used to purchase bulk quantities of

67

cocaine to be exported and distributed in Canada.  While
photographs and video recordings taken in furtherance of the
investigation may not contain the image or voice of COURNOYER,
there is an abundance of evidence that directly links COURNOYER
to the conspiracies for which he is charged.  See Chavez, 549
F.3d at 127-128 (evidence sufficient to establish that defendant
was the leader of a narcotics conspiracy even where the defendant
resided in California and the drug seizures were made in New
York).

       Further, COURNOYER's bare assertion that it would be
difficult for the jury to "conceptualize the differences between
the offenses alleged in the indictment and any other criminal
activities the co-defendants engaged in independently" is
baseless.  First, "Differing levels of culpability and proof are
inevitable in any multi-defendant trial and, standing alone, are
insufficient grounds for separate trials."  United States v.
Scarpa, 913 F.2d 993, 1015 (2d Cir. 1990) (citations omitted).
Further, "we cannot assume that a multi-defendant drug trial is
beyond the ken of the average juror."  United States v. Villegas,
899 F.2d 1324, 1347 (2d Cir. 1990).  The Second Circuit has
consistently refused to find error in a district court's
determination that severance is not warranted where the district
court makes proper use of available judicial tools to mitigate
the risk of prejudice.  See, e.g., Diaz, 176 F.3d at 54 ("[T]he

district court sufficiently cured any prejudice to Rios by (1) giving a limiting instruction to the jury on the proper consideration of Morales' blurted statement that Rios killed S. Diaz; (2) cautioning Morales for giving a similar testimony; (3) striking comparable testimony and instructing the jury to disregard it; and (4) giving the jury cautionary instructions in its final jury charge on how to treat inadmissible evidence inadvertently presented to it."). Unlike many cases where a district court has found severance to be proper, here, COURNOYER is charged in every count of the indictment. A proper jury instruction will be able to cure any potential risk of prejudice alleged by COURNOYER. Accordingly, COURNOYER has failed to demonstrate that the risk of "spillover prejudice" is "sufficiently severe" as to warrant a severance of his case from that of his co-defendants.

  2. COURNOYER Has not Demonstrated that the Defenses at Trial Would be so Antagonistic as to Warrant Severance

  COURNOYER argues that "[s]everance is warranted because Mr. COURNOYER's defense is mutually exclusive from those of his co-defendants." (Def. Mot. at 2). COURNOYER further argues that the "presumed defense for his co-defendants [at trial] is to place blame on the alleged leader, Mr. COURNOYER." (Id. at 3). COURNOYER therefore asserts that because he is the "alleged leader and subject of co-defendant finger pointing, [he] will suffer unavoidable and substantial prejudice if his trial is not

severed from those of his co-defendants." (Id.). This argument
is meritless.

Notably, the Supreme Court has ruled that mutually
antagonistic defenses are not prejudicial per se. Zafiro, 506
U.S. at 537 (four defendants not entitled to severance because of
"mutually antagonistic defenses" even where all the defendants
placed blame for ownership of narcotics on another defendant at
trial). Further, "[t]he mere fact that codefendants seek to
place the blame on each other is not the sort of antagonism that
requires a severance." United States v. Villegas, 899 F.2d 1324,
1346 (2d Cir. 1990) (citing United States v. Casamento, 887 F.2d
1141 (2d Cir. 1989)); see also United States v. Harwood, 998 F.2d
91 (2d Cir. 1993) (finding that severance was not required even
though both defendants pled ignorance and implicated the other).
After Zafiro, courts in this district have generally exercised
their discretion by denying severance motions based on
"antagonistic" defenses, rather than granting them. See, e.g.,
Persaud v. United States, No. 04 CV 2861, 2005 U.S. Dist. LEXIS
45527 (E.D.N.Y. Dec. 28, 2005); United States v. Mahaffy, 446 F.
Supp. 2d 115 (E.D.N.Y. 2006); United States v. Schlegel, No. 06
CR 0550 (JS), 2009 WL 3837305 (E.D.N.Y. Nov. 16, 2009); United
States v. Kahale, No. 09 CR 159 (KAM), 2010 WL 456860 (E.D.N.Y.
Feb. 3, 2010). When courts in the Eastern District have granted
post-Zafiro severance motions based on antagonistic defenses, it

has been because the defendants' theories necessarily could not, as a matter of logic, both be accepted as true. See, e.g., United States v. Basciano, No. 05 CR 060 (NGG), 2007 WL 3124622 at *9 (E.D.N.Y. Oct. 23, 2007) ("the jury cannot logically accept both Basciano's defense that he rescinded the Pizzolo hit and Mancuso reordered it, and Mancuso's defense that he had no involvement in the Pizzolo murder"); United States v. Copeland, 336 F. Supp.2d 223 (E.D.N.Y. 2004).

Here, the argument that the jury would be prevented "from making a reliable judgment about [COURNOYER's] guilt or innocence" merely because the possibility exists that his co-conspirators will implicate him as the leader of the continuing criminal enterprise is without merit. See Zafiro, 506 U.S. at 539. As COURNOYER acknowledges, the Court in Zafiro was also dealing with a narcotics conspiracy where four defendants had at different times moved for severance, asserting mutually antagonistic defenses. (See Def. Mot. at 3). In Zafiro, each defendant claimed that he was innocent and accused the other of the criminal conduct charged in the indictment. Zafiro, 506 U.S. at 536. The Zafiro Court explicitly rejected the theory that the "jury will conclude (1) that both defendants are lying and convict them both on that basis, or (2) that at least one of the two must be guilty without regard to whether the Government has proved its case beyond a reasonable doubt." Id. at 540.

71

Instead, the Court held that "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." Id. Courts within the Second Circuit have consistently applied this principle. See United States v. Diaz, 176 F.3d 52 (2d Cir. 1999) (holding that the district court "sufficiently cured any prejudice" by giving limiting instructions); see, e.g., United States v. Volpe, 42 F. Supp. 2d 204, 210 (E.D.N.Y. 1999) (quoting United States v. Tootick, 952 F.2d 1078, 1082 (9th Cir. 1991) (holding that severance for antagonistic defenses only appropriate when "a defendant's counsel becomes a 'second prosecutor' who 'in order to zealously represent his client . . . [does] everything possible to convict the other defendant.'").

In the instant case, COURNOYER has failed to articulate how his defense at trial will conflict with that of his co-defendants. COURNOYER's cursory and wholly speculative argument that one or more co-defendants may at trial testify as to his supervisory role in a criminal conspiracy or enterprise fails to demonstrate the type of prejudice that is "sufficiently severe" to outweigh the benefit of having a joint trial. See Walker, 142 F.3d at 110. Accordingly, COURNOYER has failed to meet his burden that he is entitled to a severance based on an antagonistic defense.

72

## CONCLUSION

      For all of the foregoing reasons, the defendant's motions are without merit and should be denied in their entirety.

Dated:    Brooklyn, New York
           July 13, 2012


                        Respectfully submitted,

                        LORETTA E. LYNCH
                        United States Attorney
                        Eastern District of New York


           By:           /s/
                        Steven L. Tiscione
                        Toni M. Mele
                        Celia A. Cohen
                        Assistant United States Attorneys


cc:  All Defense Counsel (by ECF)
      Clerk of Court (SLT) (by ECF)