SLT:AHT/TP
F.#2011R00006

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -                12 CR 065(S-2)(RJD)

JIMMY COURNOYER,
      also known as "Cosmo"
      and "Superman," and
ALESSANDRO TALONI,

            Defendants.

- - - - - - - - - - - - - - -X

**THE GOVERNMENT'S IN LIMINE MOTION FOR AN ANONYMOUS AND
PARTIALLY SEQUESTERED JURY AND TO ADMIT EVIDENCE**

                                  LORETTA E. LYNCH
                                  United States Attorney
                                  Eastern District of New York
                                  271 Cadman Plaza East
                                  Brooklyn, New York  11201

STEVEN L. TISCIONE
GINA M. PARLOVECCHIO
AMIR H. TOOSSI
TANISHA PAYNE
Assistant U.S. Attorneys
   (Of Counsel)

<u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS  . . . . . . . . . . . . . . . . . . . . . . 3

I.    Overview . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.   The COURNOYER Enterprise  . . . . . . . . . . . . . 3

      B.   COURNOYER's Prior Narcotics Convictions . . . . . . 5

II.   The Defendants' Association with Organized Crime Groups  . 7

      A.   The Bonanno and Rizzuto Organized Crime Groups  . . . 7

      B.   The Hells Angels Motorcycle Club  . . . . . . . . . 13

      C.   The Sinaloa Cartel  . . . . . . . . . . . . . . . . 14

III.  Dangerousness of the Defendants and
      Obstruction of Justice  . . . . . . . . . . . . . . . . 15

IV.   The Charges  . . . . . . . . . . . . . . . . . . . . . . 22

ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

POINT ONE - THE COURT SHOULD ORDER AN ANONYMOUS
AND PARTIALLY SEQUESTERED JURY . . . . . . . . . . . . . . . . 23

I.    Anonymity Is a Well-Established Means of
      Ensuring the Impartiality of a Jury  . . . . . . . . . . 23

II.   There Is Strong Reason to Believe That
      the Jury Needs Protection in this Case . . . . . . . . . 25

      A.   Seriousness of the Charges and the
           Dangerousness of the Defendants . . . . . . . . . . 26

      B.   Previous Attempts to Interfere with Judicial Process
           by Defendants and Their Criminal Organization . . . 28

      C.   Media Coverage  . . . . . . . . . . . . . . . . . . 35

III.  The Use of an Anonymous and Partially Sequestered
      Jury Will Not Deprive the Defendants of the
      Opportunity for Meaningful Participation in
      Jury Selection or Diminish Their
      Presumption of Innocence . . . . . . . . . . . . . . . . 43

A.  Empaneling an Anonymous Jury Does Not Burden the Defendants' Ability to Make Informed Choices During Jury Selection . . . . . . . . . . . . . . . .  44

B.  The Court Can Explain the Reasons for Anonymity and Partial Sequestration to Prospective Jurors in Neutral Terms That Will Diminish the Risk of Prejudice to the Defendants . . . . . . . . . . . . . . . .  45

POINT TWO - THE GOVERNMENT'S EVIDENCE SHOULD BE ADMITTED  . .  48

I.  Evidence of Acts Done in Furtherance of the Narcotics Trafficking and Witness Tampering Conspiracies Are Admissible as Direct Evidence of the Charged Crimes  . .  48

A.  Applicable Law . . . . . . . . . . . . . . . . . .  48

B.  Violent Acts and COURNOYER's Prior Convictions Are Direct Evidence of the Charged Crimes . . . . .  49

II.  Evidence of Prior Bad Acts and Prior Convictions of the Defendants Are Admissible Under FRE 404(b). . . .  54

A.  Applicable Law . . . . . . . . . . . . . . . . . .  54

B.  Evidence of Violence and the Defendants' Connection to Organized Crime Groups Are Admissible to Show the Background of the Conspiracy . . . . . . . . . . . .  55

C.  Evidence of COURNOYER's Possession and Use of Firearms Is Admissible to Show Knowledge and Intent, Leadership and Access to Firearms . . . . . .58

D.  COURNOYER's Prior Convictions for Distribution of Marijuana and MDMA and Use of a Firearm Are Admissible . . . . . . . . . . . . . . . . . .  59

III. The Proffered Evidence Is Not Unfairly Prejudicial . . . .60

IV.  Pursuant to Rule 609, if COURNOYER Elects to Testify, the Government Should be Allowed to Cross-Examine the Defendant Regarding Any Criminal Convictions . . . . . . .64

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . 67

<u>PRELIMINARY STATEMENT</u>

The government moves to empanel an anonymous and partially-sequestered jury for the trial of this case. As set forth below, the defendant JIMMY COURNOYER is the leader of a massive international criminal enterprise with ties to numerous organized crime groups in the United States, Canada and Mexico. Co-defendant ALESSANDRO TALONI is a long-standing associate of the Rizzuto organized crime family, a criminal syndicate based in Montreal, Canada that is considered one of the most powerful and violent organizations in Canada. COURNOYER's principal marijuana distributor and co-defendant in this case, JOHN VENIZELOS, is a long-standing associate of the Bonanno organized crime family of La Cosa Nostra (the "Bonanno family"), which has endeavored for decades to interfere with the fair administration of justice and is closely aligned with the Rizzuto family.

Moreover, defendant COURNOYER and members of his criminal organization have engaged in multiple acts of violence, including kidnaping and the solicitation of murder, and have demonstrated a willingness to seek the assistance of others to commit violent crimes against potential witnesses, including assault and intimidation, to protect their criminal interests. Therefore, the government respectfully requests that: (1) the identities of all prospective jurors, including their names, addresses, and places of employment, not be revealed to either

1

the parties or their attorneys, and (2) from the time each juror is empaneled until the conclusion of the trial, the jurors be escorted by representatives of the United States Marshals Service to and from the courthouse each day and at all times during recesses.  These precautions are necessary to ensure that the jurors are free from interference by the defendants and their criminal associates.  Moreover, these precautions will not deprive the defendants of their right to meaningful voir dire or cause any other prejudice.

The government also moves to admit evidence of acts of violence committed by or on behalf of COURNOYER in furtherance of the narcotics trafficking and witness tampering conspiracies; evidence of defendant COURNOYER's past convictions for possession of marijuana, marijuana distribution, MDMA distribution, and firearms possession during the time frame of the alleged continuing criminal enterprise; and evidence of defendants' connection to multiple organized crime groups who financed narcotics ventures, transported and distributed narcotics and provided protection for COURNOYER's criminal enterprise as direct evidence of the charged crimes.  In the alternative, the government seeks to admit such evidence pursuant to Federal Rule of Evidence 404(b).  Pursuant to Federal Rule of Evidence 609, the government also seeks to cross-examine COURNOYER regarding his criminal convictions in the event he take the stand at trial.

2

<u>STATEMENT OF FACTS</u>

I.   <u>Overview</u>

    A.   <u>The COURNOYER Enterprise</u>

Since approximately January 2007, the Drug Enforcement Administration ("DEA") has been conducting an investigation aimed at dismantling an international criminal enterprise headed by JIMMY COURNOYER (the "COURNOYER Enterprise").   The investigation has revealed that for more than a decade, COURNOYER controlled a drug trafficking empire from his base of operations in Montreal that coordinated the manufacturing, importation and distribution of more than 100,000 pounds of hydroponic marijuana into the United States from Canada.   While much of the marijuana was obtained from growers in British Colombia and brought from Western Canada to Montreal before being smuggled across the U.S. border, COURNOYER also controlled indoor warehouses in and around Montreal, which were used to grow hydroponic marijuana for importation and sale in the United States.

Among other methods, one of the principal ways in which the COURNOYER Enterprise smuggled illegal narcotics into the United States was to utilize the Akwesasne Native American Reservation, which straddles the U.S.-Canadian border in upstate New York. COURNOYER utilized garages and "stash houses" in Brooklyn, Queens, Staten Island, Pennsylvania, North Carolina, California and elsewhere, and employed a multitude of workers in New York to

3

distribute the marijuana and collect the marijuana proceeds. COURNOYER also employed the services of other criminal groups, including the Hells Angels Motorcycle Club, to transport bulk quantities of marijuana using tractor trailers hidden inside seemingly legitimate commercial loads.

COURNOYER also arranged to transport millions of dollars in cash from marijuana sales in the New York area to California and Mexico.  The marijuana proceeds were used to purchase cocaine from the Sinaloa Cartel in Mexico which was exported to Canada for distribution.

In addition, the COURNOYER Enterprise was also involved in the manufacture of tens of thousands of MDMA (ecstasy) pills for importation and distribution in the United States.

Finally, COURNOYER arranged for illegal firearms to be smuggled from the United States into Canada and supplied these weapons to members of his criminal enterprise as well as several organized crime groups affiliated with the COURNOYER Enterprise.

During the course of the investigation (and prior operations undertaken by Canadian law enforcement), U.S. and Canadian agents made numerous seizures of narcotics, narcotics proceeds and weapons from members and associates of the COURNOYER Enterprise, including hundreds of pounds of marijuana, more than 800 marijuana plants, over 80 kilograms of cocaine, approximately $10,000,000.00 in narcotics proceeds and multiple firearms.

B.   <u>COURNOYER's Prior Narcotics Convictions</u>

On October 31, 1998, COURNOYER was arrested by officers from the Laval Police Service in Quebec and charged with possession of marijuana.   As part of the law enforcement investigation, an undercover officer purchased marijuana from COURNOYER, who was running a marijuana grow operation inside a Laval apartment he shared with his brother.   A search of COURNOYER's apartment resulted in the seizure of 11 marijuana plants and several pounds of packaged marijuana.

Subsequently, on December 14, 2000, COURNOYER and two of his co-conspirators were stopped by local law enforcement on the Kanesatake Mohawk Reservation in southern Quebec, just outside of Montreal.   Police officers pulled over the rental truck that COURNOYER was driving and smelled a strong odor of marijuana. After a search of the rental truck, police officers discovered 16.5 pounds of marijuana and $26,000 (CAD).   The investigation revealed that COURNOYER and his co-conspirators were selling marijuana to a Native American smuggler on the Kanesatake Reservation and that the 16.5 pounds of marijuana recovered from the vehicle was all that remained from a much larger shipment that the three men had delivered to the smuggler prior to being detained by police.

COURNOYER successfully moved to have the Kanesatake reservation case consolidated with the 1998 Laval case described above in the Laval Provincial Court.   In 2000, COURNOYER pleaded

5

guilty to production of marijuana and distribution of marijuana, both felonies, and was sentenced to a fine of $2,000 (CAD).  As a condition of COURNOYER's plea, the charges arising from the Kanesatake reservation stop were dismissed.

On December 2, 2001 COURNOYER was arrested by officers from the Peel Regional Police[1] and charged with MDMA distribution and gun possession.  During the law enforcement operation, an undercover police officer arranged to purchase 10,000 MDMA pills from COURNOYER and a co-conspirator, who were involved in manufacturing the MDMA and importing it into the United States for distribution.  After the undercover transaction was completed, officers arrested COURNOYER, who tried to flee and then pulled a loaded firearm out and attempted to use it to escape capture.  The arresting officer managed to subdue COURNOYER before he could use the weapon, and a subsequent search of COURNOYER revealed that he was carrying a .45-caliber handgun with armor-piercing bullets.  In 2005, COURNOYER pleaded guilty to MDMA distribution and firearms possession, both felonies, and was sentenced to 30 months' incarceration.[2]

---

[1]  Peel is a municipality near Toronto, Canada.

[2]  This sentence was later increased when COURNOYER committed vehicular manslaughter, while released on bond, by driving his Porsche Cayenne at an excessive rate of speed and crashing, resulting in the death of his passenger.

II.   The Defendants' Association with Organized Crime Groups

        The government's evidence at trial will show that, in furtherance of his vast criminal enterprise, COURNOYER maintained relationships with some of the most notorious criminal gangs in North America, including the Rizzuto crime family of La Cosa Nostra (which financed COURNOYER's marijuana trafficking activities, partnered with the COURNOYER Enterprise in order to obtain cocaine from Mexican drug cartels, received and used firearms that COURNOYER smuggled into Canada from the United States and provided protection for the Enterprise in Canada), the Bonanno crime family of La Cosa Nostra (which received and distributed a large portion of the marijuana imported into the United States by the COURNOYER Enterprise), the Sinaloa Cartel (which laundered COURNOYER's marijuana proceeds and supplied the COURNOYER Enterprise and its Rizzuto allies with cocaine) and the Hells Angels Motorcycle Club (which transported marijuana and marijuana proceeds across Canada and into the United States for COURNOYER's enterprise).   Each of these criminal groups and the defendants' relationships with them are discussed below.

        A.   The Bonanno and Rizzuto Organized Crime Groups

        The Bonanno Family is a violent criminal enterprise based in New York City with a lengthy history of jury tampering and obstruction of justice.   The principal purpose of the Bonanno Family is to generate money for its members and associates through

a wide range of criminal activities, including drug trafficking, robbery, extortion, illegal gambling and loansharking. In addition, members and associates of the Bonanno family use the resources of the Bonanno family to settle personal grievances and vendetta, and carry out acts of violence, including murder and assault. The members and associates engage in conduct designed to prevent government detection of their illegal activities including a commitment to murdering person who are perceived as potential witnesses against members and associates of the enterprise.

The Rizzuto crime family, sometimes referred to as the "Sixth Crime Family," is a violent criminal enterprise based in Montreal, Canada responsible for importing and distributing tons of heroin, cocaine and marijuana in Canada, laundering hundreds of millions of dollars, lending out millions more through loansharking operations and has profited handsomely from illegal gambling, fraud and contract killings. Historically, the Rizzuto crime family, which has controlled much of Montreal's drug trade for decades, has a longstanding relationship with the Bonanno family and was considered by many in La Cosa Nostra as a branch of the Bonanno family.

At trial, the government will introduce evidence and elicit testimony demonstrating COURNOYER's connection to both the Rizzuto and Bonanno crime families. With respect to the Rizzuto crime family, several cooperating witnesses are expected to testify

8

that COURNOYER repeatedly told his confederates that he was "backed by the Italians," which, in the parlance of the Montreal criminal underworld, was a reference to the Rizzuto family, which has long dominated the Montreal drug trade.  Witnesses will further testify regarding COURNOYER's association with known members of the Rizzuto family, including Rizzuto soldiers who acted as COURNOYER's drivers, bodyguards and enforcers.   Cooperating witnesses will further testify that COURNOYER arranged to procure weapons from the United States and smuggle them into Canada in order to supply the firearms to members of the Rizzuto family.  Finally, the government will introduce recorded prison calls in which COURNOYER and members of his criminal enterprise discussed their association with several Rizzuto soldiers and associates, the December 2012 shooting of Rizzuto soldier Giuseppe Fetta (who acted as a driver and bodyguard for COURNOYER) and the murder of Joseph Di Maulo (a former Rizzuto confidante and high ranking member of the Montreal Mafia who was shot outside his home shortly after Vito Rizzuto's return to Montreal following a prison term in the United States for his role in the execution of three captains in the Bonanno crime family).

The investigation further revealed that COURNOYER's money laundering and cocaine trafficking operations in California were being run by TALONI, who himself has strong ties to the Rizzuto crime family.  On April 27, 1999, TALONI was arrested by members of the Montreal Police Department for assaulting the owner of a mens

clothing shop in Montreal.  At the time, Taloni was working at a rival mens clothing shop and told the victim owner that he would "destroy [him]" and "kill [him] with [his] bare hands."  When TALONI was arrested, police officers found in his possession a business card that contained a telephone number for "Vito Rizz."[3] Notably, the telephone number associated with "Vito Rizz" belonged to Café Consenza in Montreal, which served as the headquarters for the Rizzuto crime family.[4]  The card also contained a phone number for Pat Ragusa, the step brother of Nick Rizzuto, Jr. (son of Vito Rizzuto who was murdered in December 2009 during the ongoing mafia war in Montreal).

At trial, the government will introduce evidence demonstrating that TALONI was one of COURNOYER's contacts in Southern California that facilitated COURNOYER's cocaine trafficking.  In April 2011, COURNOYER asked a co-conspirator (CW-1) who, unbeknownst to COURNOYER, was cooperating with government, if CW-1 could arrange to transport $1 million in cash from New York to California.  CW-1 agreed to transport $200,000 of the total $1

---

[3]     Vito Rizzuto is the boss and highest ranking member of the Rizzuto crime family.

[4]     The Royal Canadian Mounted Police ("RCMP") conducted electronic surveillance in Café Consenza, including hidden audio and video bugs, between 2004 and 2006, as part of Project Colisée, a law enforcement operation targeting the Rizzuto crime family's drug and bookmaking operations in Montreal.  Project Colisée resulted in the arrest of more than 90 members and associates of the Rizzuto family, including several of its top-ranking members.

million shipment and COURNOYER agreed to pay a 6% commission for the transfer, meaning that only $188,000 of COURNOYER's money would actually be received in California.  COURNOYER provided CW-1 with a phone number for the person who would receive the money.  When an undercover DEA agent called the phone number provided by COURNOYER, he spoke to an unidentified man – later identified as co-defendant TALONI – to arrange for the delivery of the $188,000.  On April 29, 2011, the undercover DEA agent delivered the $188,000 to TALONI. The DEA, in conjunction with local law enforcement, maintained surveillance on TALONI and observed him drive to the Beverly Hills Hotel where he met with another male, Joseph Forte, who delivered approximately $800,000 in cash in a large suitcase to TALONI. Notably, Forte had flown from Teeterboro Airport in New Jersey to Los Angeles on a private plane days before he met with TALONI.

TALONI was detained shortly after he was observed picking up the large suitcase from Forte.  In TALONI's vehicle, law enforcement agents found five pre-paid cell phones, an Apple iPhone, a blackberry and $60,000 in cash.  Further, at the time of TALONI's detention, agents recovered approximately $900,000 and 34 kilograms of cocaine from inside of residences used by TALONI and another associate of the COURNOYER Enterprise.

With respect to the Bonanno crime family, the government's evidence at trial will show that COURNOYER's enterprise supplied the Bonanno crime family with thousands of

pounds of marijuana between 2007 and 2012.  Specifically, during the course of the investigation, multiple cooperating witnesses, all of whom were part of COURNOYER's marijuana distribution network in New York City, identified co-defendant JOHN VENIZELOS[5], an associate of the Bonanno crime family, as a primary recipient of marijuana imported into the United States by COURNOYER's enterprise.  Based on information received from multiple witnesses, court-authorized wiretap interceptions, physical surveillance and drug ledgers seized from multiple stash houses used by the COURNOYER Enterprise, DEA agents arrested VENIZELOS and obtained a warrant authorizing the search of VENIZELOS' residence in Staten Island, New York, as well as the basement of his parents' home, where VENIZELOS was temporarily living due to storm damage at his primary residence.[6]  Upon executing the search of VENIZELOS' parents' basement, DEA agents discovered approximately $100,000.00 in United States currency.  The search of VENIZELOS' primary residence revealed multiple heat-sealed packages of distribution-quantity amounts of hydroponic marijuana; a narcotics scale; drug ledgers; a shotgun; a loaded Glock 23 semi-automatic handgun; and multiple boxes of ammunition.  A subsequent firearm trace performed by the Bureau of Alcohol, Tobacco, Firearms and Explosives revealed

---

[5]  On May 6, 2013, VENIZELOS pleaded guilty to marijuana distribution.

[6]  See Affidavit in Support of Search Warrant by Special Agent Eric Tyler dated November 27, 2012 (attached as Exhibit A).

that the Glock handgun was stolen from a Special Agent with the South Carolina Law Enforcement Division.

VENIZELOS' association with the Bonanno crime family is evidenced by cooperating witnesses' anticipated testimony that VENIZELOS told them that his drug trafficking activities were "backed" by a soldier in the Bonanno Family and that he was under Bonanno protection.  In addition, during a search of VENIZELOS' residence, DEA agents found numerous documents demonstrating his connection to the Bonanno crime family, including letters from another associate of the Bonanno crime family addressed to VENIZELOS which discuss mob activity, court documents reflecting charges against members and associates of La Cosa Nostra and other documents reflecting his management and part-ownership interest in Jaguars 3, a mob-owned strip club in Brooklyn.

B.  The Hells Angels Motorcycle Club

The Hells Angels Motorcycle Club (the "Hells Angels") is an outlaw motorcycle gang with approximately 2,000 and 2,500 members who belong to over 230 chapters in the United States and 26 countries, including Canada.  The Hells Angels are involved in the production, transportation and distribution of marijuana and other drugs.  The Hells Angels are also involved in other criminal activity including assault, extortion, murder and money laundering.

13

The government's evidence at trial will show that the COURNOYER Enterprise utilized members of the Hells Angels in Canada and the United States to transport its marijuana and marijuana proceeds. Multiple cooperating witnesses are expected to testify that the Hells Angels were frequently tasked by the COURNOYER enterprise with driving loads of marijuana across Canada (from Vancouver to Montreal) and into the United States (through the Akwesasne reservation). In addition, the COURNOYER Enterprise also used members of the Hells Angels to use violence and threats of violence against individuals in order to collect drug debts.

C.   The Sinaloa Cartel

The Sinaloa Cartel is a Mexican drug trafficking organization responsible for bringing multi-ton quantities of narcotics, including cocaine and marijuana, from Mexico into the United States through an enterprise of distribution cells in the United States and Canada. The Sinaloa Cartel is known to regularly collaborate with U.S.-based gangs and outlaw motorcycle gangs, like the Hells Angels, to assist in or commit kidnapings, acquire or sell drugs, and collect drug proceeds in the United States. The Sinaloa Cartel is also believed to be responsible for innumerable acts of violence, including murder, and the laundering of billions of dollars in criminal proceeds from illegal drug trafficking organizations.

14

At trial, the government's evidence will show that one of the methods used by the COURNOYER Enterprise to launder its money was to use marijuana proceeds from marijuana sold in the United States to purchase cocaine from members of the Sinaloa Cartel in Mexico. The government will call as a witness an undercover DEA agent who posed as a money launderer and negotiated transfers of cash for the Sinaloa Cartel between 2009 and 2010. During one such transaction, the undercover DEA agent was advised by his counterpart in Mexico that the cash pickup – which was to occur in New York and was comprised of money generated by COURNOYER's marijuana distribution network – was for money that belonged to "Chapo," the leader of the Sinaloa Cartel. Other evidence in the government's case-in-chief will demonstrate that COURNOYER directed the delivery of cash from New York to California in order to purchased cocaine that had already been smuggled into the U.S. through the Mexican border and which would, in turn, be exported to Canada for distribution by the COURNOYER Enterprise and its partners in the Rizzuto crime family.

III. <u>Dangerousness of the Defendants and Obstruction of Justice</u>

Beyond demonstrating an uncanny skill in making connections with an array of criminal groups, COURNOYER has proved capable of committing acts of violence himself and directing his subordinates to do the same.

For example, on December 2, 2001, COURNOYER was arrested by the Peel Police Department and charged with distribution of ecstasy and gun possession after an undercover police officer purchased 10,000 pills of ecstasy from COURNOYER and a co-conspirator, Alexandru Duhlberger. When the Peel Police Department attempted to place COURNOYER under arrest, he resisted and tried to unleash a .45-caliber firearm loaded with hollow-point, armor-piercing bullets to effectuate his escape. COURNOYER was placed under arrest only after law enforcement agents wrestled the loaded .45-caliber firearm from COURNOYER's possession. As noted above, COURNOYER subsequently pleaded guilty to narcotics trafficking and possession of a firearm and was sentenced to 30 months' incarceration.

COURNOYER's dealing in firearms was not limited to his encounter with the Peel Police Department. Indeed, several cooperating witnesses are expected to testify that COURNOYER regularly possessed weapons, including firearms that were stored at an apartment in Laval, Quebec which COURNOYER and his co-conspirators used to conduct narcotics transactions. The cooperating witnesses are also expected to testify that COURNOYER imported firearms from the United States to Canada and sold them to members of the Italian mafia in Montreal and the Hells Angels.

COURNOYER was also willing to use violence to collect drug debts and exact retribution against customers who stole from

16

him.  After COURNOYER served his sentence for narcotics trafficking and firearms possession, according to numerous cooperating witnesses, some of whom are corroborated by wiretap recordings, COURNOYER directed subordinates to use and threaten to use violence against those who owed COURNOYER money.  For example, in 2009, COURNOYER directed CW-2 and CW-3 to collect a debt on his behalf using extortionate means.  COURNOYER asked CW-2 to ask CW-3 to collect $250,000 from a limo driver in New York City.  COURNOYER provided CW-2 with the limo driver's phone number; CW-2 then passed the phone number to CW-3, who proceeded to issue threats to the limo driver – both in person and over the phone – in order to collect the debt.  Other witnesses are expected to testify regarding COURNOYER's use of subordinates to physically assault and threaten individuals in order to collect debts owed to COURNOYER. For example, in 2010, two individuals, a female associate ("victim-1") and her boyfriend, owed COURNOYER approximately $90,000 in connection with a drug debt.  COURNOYER sent two subordinates to victim-1's place of business in order to collect the debt.  After the two men learned that victim-1 did not have the money owed to COURNOYER, they punched her several times and threatened further harm if she did not repay the debt.

The government further anticipates eliciting evidence that, after a cooperating witness (CW-4) stole over $1 million dollars worth of marijuana from the COURNOYER enterprise, COURNOYER

17

hired several criminal associates to kidnap CW-4's girlfriend ("victim-2") in Montreal, Quebec. Specifically, after she was stalked and followed for several days, victim-2 was grabbed from a sidewalk in Montreal, a hood was placed over her head, she was thrown into the back of a van and driven to an undisclosed location approximately an hour outside of Montreal, where the men who abducted her began interrogating her for information about CW-4's whereabouts. During her abduction, victim-2 was repeatedly punched in the face and abdomen, her shirt was ripped open, she was threatened with torture (including the dismemberment of her fingers) and told that she and her child would be killed if she didn't help the men find CW-4.

Furthermore, after COURNOYER's subsequent incarceration, he demonstrated a willingness to use violence to evade prosecution and protect his enterprise. For example, COURNOYER repeatedly made statements to co-conspirators evidencing his intent to tamper with potential witnesses. On more than one occasion, COURNOYER named several individuals whom he believed were witnesses against him and stated that he intended to kill them. COURNOYER also told a cooperating witness that he (COURNOYER) was going to attempt to frame an individual whom he believed was cooperating with the government as a witness against him. Specifically, COURNOYER stated that he intended to have VENIZELOS (who had not yet been

arrested) have some of his criminal associates plant a gun in the potential witness' car.

Moreover, co-defendant VENIZELOS also attempted to intimidate and threaten potential witnesses against him and, in the process, confirmed COURNOYER's plans to use violence and intimidation to prevent cooperating witnesses from testifying against him. Specifically, DEA agents obtained a blackberry device which revealed a series of encrypted messages sent by VENIZELOS to a co-conspirator ("CW-5") in the instant case that evinced a clear attempt to intimidate CW-5 from providing information to law enforcement.[7] Specifically, after the indictment and arrests of COURNOYER and half a dozen other members of the COURNOYER Enterprise, VENIZELOS learned that CW-5 had been approached by the DEA and questioned regarding the COURNOYER investigation. VENIZELOS expressly directed CW-5 not to mention anything about him (VENIZELOS) to the DEA. For the next several weeks, VENIZELOS continued to keep tabs on CW-5 – particularly to find out whether the DEA was investigating VENIZELOS and to ensure that CW-5 had not said anything to law enforcement about VENIZELOS or his connection to the COURNOYER Enterprise. VENIZELOS then attempted to dissuade CW-5 from cooperating with law enforcement by informing CW-5 that COURNOYER and his organization had millions of dollars set aside to

---

[7] See Affidavit of Special Agent Eric Tyler in Support of Revocation of Bond for Defendant JOHN VENIZELOS, dated February 1, 2013 (attached as Exhibit B).

19

murder or otherwise retaliate against any individuals who cooperated with the government. On November 24, 2012 (just days before his arrest), VENIZELOS sent an encrypted message to CW-5, warning CW-5 that he/she had better hope that COURNOYER or members of his organization never found out that CW-5 had spoken with law enforcement agents because COURNOYER has $2 million set aside to pay for the murder of cooperating witnesses:

> U just got to hope they never find out u said
> a word.  Seriously bro.  I know he has like 2
> mil away just to pay guys to handle that once
> he sentenced

Similar messages carried on this campaign of intimidation and attempts to influence CW-5 (albeit more subtly than the message discussed above).  For example, in one message, VENIZELOS instructed CW-5 "make sure u don't have to testify."  Also, on another occasion VENIZELOS inquired on several occasions whether CW-5 had identified him (VENIZELOS) as the Staten Island recipient for COURNOYER's marijuana.

In other messages, VENIZELOS directed CW-5 to avoid discussing anything about VENIZELOS with law enforcement agents. For example, in a message sent on December 2, 2012, VENIZELOS directed CW-5 to withhold information from law enforcement agents regarding his role and solicited CW-5's assistance in getting other potential witnesses to do the same:

> I need ur word if they put [me] on the case u
> say what u said and how that's not true.  In
> other words stick to ur story.  If u can get

20

> word to lj or whoever to do that also be
> great.

In a follow-up message the same day, VENIZELOS continued his attempts to involve CW-5 in a conspiracy to influence witnesses and obstruct justice by stating:

> [I'm] not gonna say shit unless they [other witnesses] throw me under bus.  And if they do hope u can talk to lawyer and tell them [I] was not the guy!  Cause ur friends with [me] and when u met people u didn't see them!  Etc. Etc. . .

VENIZELOS also attempted to solicit CW-5's help in threatening witnesses:

> I'm just saying it for them, cause if they fuck [me] tell them if [I] can [I] will ruin there deals with every way possible. . .

In addition, the government's evidence will show that COURNOYER has used attorneys to attempt to prevent co-conspirators from testifying against them.  Specifically, based on information received from cooperating witnesses, whose information have been deemed reliable and corroborated by other evidence, on various occasions, COURNOYER has paid for attorneys to represent co-conspirators for the purpose of dissuading them from cooperating with the government.  In addition, COURNOYER has sent messages through attorneys to co-conspirators promising to take care of them financially if they did not testify against COURNOYER.

21

IV.  <u>The Charges</u>

On April 3, 2013, a grand jury in the Eastern District of New York returned a superseding indictment in <u>United States v. Jimmy Cournoyer et al.</u>, 12 CR 065 (SLT), charging COURNOYER with: (1) engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848 (Count One); (2) conspiracy to import 1,000 kilograms or more of marijuana in violation of 21 U.S.C. §§ 952(a), 960(b)(1)(G), and 963 (Count Two); (3) conspiracy to distribute 1,000 kilograms or more of marijuana in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(vii) (Count Three); (4) conspiracy to manufacture and distribute 1,000 kilograms or more of marijuana, intending and knowing that such substance would be unlawfully imported into the United States from a place outside thereof, in violation of 21 U.S.C. §§ 959(a), 959(c), 960(b)(1)(G) and 963 (Count Four); conspiracy to export five kilograms or more of cocaine in violation of 21 U.S.C. §§ 953(a), 960(b)(1)(B)(ii) and 963 (Count Five); conspiracy to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(ii) (Count Six); distributing and possessing with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(ii)(II) (Count Seven); using and carrying firearms in furtherance of drug trafficking crimes in violation of 18 U.S.C. § 924(c) (Count Eight); conspiracy to launder narcotics proceeds in violation of 18 U.S.C. § 1956(h)

22

(Count Nine); a witness tampering conspiracy in violation of 18 U.S.C. §§ 1512(k) (Count Ten); and witness tampering in violation of 18 U.S.C. §§ 1512(b)(3). TALONI is charged in Counts Five, Six, Seven and Nine.


<u>ARGUMENT</u>

<u>POINT ONE</u>

<u>THE COURT SHOULD ORDER AN ANONYMOUS
AND PARTIALLY SEQUESTERED JURY</u>

I.   Anonymity Is a Well-Established Means of
     <u>Ensuring the Impartiality of a Jury</u>

The Second Circuit has long recognized that anonymous juries are often necessary to protect the integrity of trials and to ensure juror impartiality, and "when genuinely called for and when properly used . . . do not infringe a defendant's constitutional rights." <u>United States v. Thai</u>, 29 F.3d 785, 800-01 (2d Cir. 1994) (quoting <u>United States v. Vario</u>, 943 F.2d 236, 239 (2d Cir. 1991). This is especially true where jurors may be unwilling to return an impartial verdict due to fear of retribution. <u>See</u>, <u>e.g.</u>, <u>United States v. Persico</u>, 832 F.2d 705, 717 (2d Cir. 1987) (upholding the decision to empanel an anonymous jury in the racketeering and bribery case of Alphonse "Allie Boy" Persico, "a trusted adviser and an initiate member of the [Colombo] Family," based on "the violent acts alleged to have been committed in the normal course of Colombo Family business, the Family's

23

willingness to corrupt and obstruct the criminal justice system, and the extensive publicity" generated by the case); United States v. Amuso, 21 F.3d 1251, 1264-65 (2d Cir. 1994) (upholding the decision to empanel an anonymous jury in the racketeering, tax fraud and conspiracy case against the boss of the Luchese family); United States v. Locascio, 6 F.3d 924, 946-47 (2d Cir. 1993) ("Locascio I") (upholding the decision to empanel a sequestered anonymous jury in the RICO and murder case against the boss and underboss of the Gambino family based, in part, on "the government's evidence of previous instances of jury tampering by [Gambino boss John] Gotti and his associates").

The Second Circuit has adopted a two-step process for determining whether to empanel an anonymous jury.  A district court should first determine whether there is strong reason to believe that the jury needs protection.  If there is, the court should then take reasonable precautions to minimize any prejudice that an anonymous jury might entail.  See, e.g., Thai, 29 F.3d at 801 (2d Cir. 1994); United States v. Paccione, 949 F.2d 1183, 1192 (2d Cir. 1991); United States v. Barnes, 604 F.2d 121, 141 (2d Cir. 1979). Within those general parameters, the decision to use an anonymous jury is left to the sound discretion of the trial court.  See, e.g., Paccione, 949 F.2d at 1192; United States v. Maldonado-Rivera, 922 F.2d 934, 971 (2d Cir. 1990).

The Second Circuit has identified five factors relevant to determining the propriety of empaneling an anonymous jury: (1) the seriousness of the charges; (2) the dangerousness of the defendant; (3) the defendant's ability to interfere with the jury, either by himself or through a criminal organization of which he is a member; (4) previous attempts to interfere with the judicial process by the defendant or his associates; and (5) the amount of public and media attention expected during the trial that might expose the jurors to extraordinary pressures that might impair their ability to be fair.  See Thai, 29 F.3d at 801; Paccione, 949 F.2d at 1192-93; United States v. Tutino, 883 F.2d 1125, 1132 (2d Cir. 1989); Persico, 832 F.2d at 717; see also United States v. Wong, 40 F.3d 1347, 1376 (2d Cir. 1994) (court's decision to empanel anonymous jury may be based on government's pre-trial proffer).

II.   There Is Strong Reason to Believe That
      the Jury Needs Protection in this Case

The specific charges contained in the Superseding Indictment, the prior attempts to obstruct justice and tamper with witnesses by defendants and their criminal cohorts, and the defendants' long-standing leadership, membership in and/or association with large-scale international drug trafficking enterprises and numerous violent organized crime groups are more than sufficient to necessitate an anonymous and partially sequestered jury in this case.  Not only is there a real risk of

25

juror tampering, but the nature of the case and the character of the government's evidence may impact the jury absent anonymity. Even in the absence of threats or other specific obstructive conduct, jurors whose identities are made public may reasonably fear repercussions if they vote to convict.

A.   Seriousness of The Charges and
     Dangerousness of the Defendants

The defendants are charged with serious crimes carrying the potential for significant sentences.  In particular, JIMMY COURNOYER is charged with being the principal leader of a continuing criminal enterprise and faces a mandatory life sentence if convicted of the top charge in the Indictment.  COURNOYER also faces mandatory consecutive sentences for his use of firearms during the commission of drug trafficking offenses as well as witness tampering charges based on his efforts to coerce, intimidate and even murder cooperating witnesses.  Both defendants are charged with being core members of an international drug trafficking network that has been in existence for more than a decade and has used violence, intimidation and fear to advance and protect its criminal interests.  Accordingly, the seriousness of the charges and dangerousness of the defendants strongly weighs in favor of an anonymous and sequestered jury.

In a detailed and well-reasoned opinion issued in connection with a case involving similar continuing criminal enterprise and narcotics distribution charges against the leader

26

and several members of a large-scale narcotics organization, Judge Matsumoto recently held that the seriousness of the charged offenses weighed in favor of empaneling an anonymous and partially-sequestered jury where the indictment alleged that "defendants participated in a lengthy narcotics distribution conspiracy and that the majority of defendants possessed, brandished and discharged firearms during the course of the drug trafficking conspiracy." United States v. Barret, 2011 WL 6704862, *21 (E.D.N.Y. Dec. 21, 2011). Judge Matsumoto further noted that the defendants' leadership and membership in the "Fatherless Crew," a violent Jamaican drug posse, as well as allegations that members of the organization had engaged in violence in support of their narcotics activities provided "ample evidence that the defendants are dangerous." Id. at *22.

Similarly, in United States v. Barnes, the Second Circuit affirmed the use of an anonymous jury in a fifteen-defendant trial in which the lead defendant was charged with operating a "continuing criminal enterprise," numerous defendants were charged with conspiring to distribute narcotics and one defendant was charged with carrying a firearm during the commission of a federal felony. 604 F.2d 121, 130 (2d Cir. 1979). The Circuit Court noted in particular that the charges that defendants faced were "serious[:] the distribution of massive quantities of narcotics on the streets of Harlem and the South Bronx from which enormous

profits were realized [in] an operation which had continued over a period of years." Id. at 134.

Indeed, when faced with analogous criminal enterprise, drug trafficking, firearm and/or witness tampering charges, federal courts have repeatedly recognized the need to protect the jury. See, e.g., United States v. Patino Restrepo, 02 CR 1188 (S-8) (2010 trial) (Dearie, J.) (granting government's request for an anonymous jury in trial of Colombian drug kingpin); United States v. Khan, 591 F. Supp. 2d 166, 170-71 (E.D.N.Y. 2008) (ordering anonymous jury in CCE trial against Guyanese drug lord; although defendant "is not charged with crimes considered to be per se violent in nature," his "involvement with and leadership of a criminal organization indicates his propensity for violence"); United States v. Wilson, 493 F. Supp. 2d 397, 398-400 (E.D.N.Y. 2006) (Garaufis, J.) ("Defendant's criminal history and his participation in a large scale criminal enterprise [the Stapleton drug crew] without question show that he is dangerous and weigh heavily in favor of using an anonymous, partially-sequestered jury. . .").

B.   Previous Attempts to Interfere with Judicial Process by Defendants and Their Criminal Organization

As discussed above, COURNOYER and VENIZELOS engaged in an escalating pattern of corrupt persuasion, intimidation, and outright death threats against multiple potential witnesses. The Court has already found probable cause to believe that VENIZELOS tampered with witnesses while released on bond in the instant

28

matter, resulting in his remand.  Moreover, on April 3, 2013, a grand jury in this district returned a superseding indictment against COURNOYER for conspiring to commit witness tampering and engaging in conduct designed to intimidate or otherwise corruptly persuade multiple witnesses from testifying against him by, among other things, explicitly threatening the murder of several individuals he believed were assisting law enforcement.

These allegations of witness intimidation and death threats, corroborated by text messages explicitly announcing COURNOYER's role in directing the witness tampering efforts of his cohorts, clearly demonstrate that COURNOYER and his co-conspirators are "willing to interfere with the judicial process by murdering government witnesses."  Amuso, 21 F.3d at 1264-65.  "The murder of a cooperating witness is particularly harmful to the judicial process as it (i) eliminates 'a witness who could have provided incriminating evidence against the defendant,' and (ii) sends 'a powerfully frightening message to others of the terrible consequences awaiting anyone who cooperated in the defendants' prosecution.'"  Khan, 591 F. Supp. 2d at 170 (quoting United States v. Quinones, 511 F.3d 289, 295-96 (2d Cir. 2007)).

As numerous courts in this Circuit have recognized, "to support a finding that an anonymous jury is warranted, obstruction of justice need not relate to prior jury tampering efforts, but instead may relate solely to efforts to tamper with witnesses."

29

United States v. Prado, No. 10-CR-74, 2011 WL 3472509, at *3
(E.D.N.Y. Aug. 5, 2011) (Bianco, J.); see also United States v.
Blackshear, 313 Fed. Appx. 338, 343 (2d Cir. 2008) (finding that
"[i]t does not seem unreasonable to infer that jurors might also be
threatened" by defendant previously found to intimidate potential
witnesses); United States v. Aulicino, 44 F.3d 1102, 1116-17 (2d
Cir. 1995) (upholding use of anonymous jury where defendants
attempted to tamper with witnesses); Thai, 29 F.3d at 801
(upholding anonymous jury, in part because of allegations that
defendants intimidated and attempted to kill victims for
complaining to police); United States v. Gotti, 2004 U.S. Dist.
LEXIS 20270, *8-9 (S.D.N.Y. Oct. 6, 2004) ("It is no great leap
from the intimidation and murder of potential informants to jury
tampering.").

        Indeed, the case law is replete with instances where
district court judges have empaneled an anonymous jury on the basis
of witness tampering, even without any allegations that defendants
attempted to tamper with jurors. See, e.g., United States v.
Quinones, 511 F.3d 289, 295-96 (2d Cir. 2007) (holding that
murdering a witness "threatened the judicial process both by
eliminating a witness who could have provided incriminating
evidence against defendants and by sending a powerfully frightening
message to others of the terrible consequences awaiting anyone who
cooperated in defendants' prosecution"); United States v.

30

Argentina, 173 Fed. Appx. 90, 92-93 (2d Cir. 2006) (extreme violence and threats to witnesses and victims); Aulicino, 44 F.3d at 1116-117 (anonymous jury warranted where, *inter alia*, co-conspirators allegedly sought to bribe a witness in their federal case, attempted to influence a witness in a prior state prosecution, and were caught on tape indicating that defendant's father would interfere with witnesses on defendant's behalf); Barret, 2011 WL 6704862, at *23 (anonymous and partially sequestered jury warranted due to defendants' attempts to intimidate witnesses despite absence of allegations of prior jury tampering); United States v. Antico, 2010 U.S. Dist. LEXIS 57919 (E.D.N.Y. June 11, 2010) (Amon, J.) (anonymous jury warranted by defendant's prior acts of intimidating witnesses).

Moreover, COURNOYER and TALONI have extensive contacts with numerous domestic and international criminal groups. While many of their criminal associates and underlings have been arrested, hundreds of co-conspirators remain at large. See Government's Response to Cournoyer's Motion to Dismiss the Indictment, Attachment A (providing list of more than 450 co-conspirators).

As Judge Amon explained in United States v. Antico, "the inquiry is not limited to whether [a defendant] himself has the ability to interfere with the jury, but rather whether he has the power to do so through the criminal organization of which he is a

member." 2010 U.S. Dist. LEXIS 57919 at *9. The defendants'
association with and positions within the charged criminal
enterprise as well as the Bonanno and Rizzuto crime families, the
Hells Angels and the Sinaloa Cartel, suggest exactly such an
ability. See United States v. Gammarano, 2007 WL 2077735, *5
(E.D.N.Y. July 18, 2007)(Sifton, J.)(personal involvement in jury
tampering not necessary to empanel anonymous jury where other
members of criminal enterprise historically have sought to
undermine the judicial process); United States v. Ochoa-Vasquez,
428 F.3d 1015, 1034 (11th Cir. 2005) ("anonymous jury may be
justified even when the defendant has not attempted to interfere
with the current proceedings, if he belongs to a group that has a
history of interfering with other judicial proceedings"). Indeed,
despite his incarceration, COURNOYER was nonetheless able to direct
efforts by his criminal associates to tamper with potential
witnesses against him, including using co-defendant and Bonanno
associate VENIZELOS to threaten and intimidate witnesses.

The Bonanno family has a long history of violence and
obstruction of justice. The numerous convictions of Bonanno family
defendants in this district over the last few years demonstrate
that the Bonanno family is an exceedingly violent and dangerous
criminal enterprise that has flourished through the commission of
countless criminal acts, including multiple murders, murder
conspiracies, and attempted murders, as well as assaults, arson,

extortions, loansharking, and robberies.  See, e.g., United States v. Massino, et al., 02 CR 307 (S-20) (NGG) (convicting after jury trial Bonanno family boss Joseph Massino); United States v. Basciano, et al., 05 CR 60 (NGG) (convicting after jury trial Bonanno family acting boss Vincent Basciano); United States v. Amato, et al., 03 CR 1382 (S-1) (NGG) (convicting after jury trial Bonanno family soldiers Baldassare Amato and Stephen Locurto, and Bonanno family associate Anthony Basile); United States v. Massino, et al., 03 CR 929 (NGG) (convicting after jury trial Bonanno family acting boss Vincent Basciano and Bonanno family captain Patrick DeFilippo).  Indeed, the hallmark of membership in the Bonanno family is the oath of allegiance that requires members of the family to commit acts of violence, including murder, when called upon to do so.

In order to secure the complete obedience of its members to these rules, the Bonanno family prescribes death as a punishment for those of its members and associates who cooperate with law enforcement.  For example, in September 2003, during a Bonanno family administration meeting that was consensually recorded by a cooperating witness, then-Bonanno family acting consigliere Anthony Urso urged the necessity of killing cooperating witnesses and their families as a means of preserving the criminal enterprise:

> [Y]ou gotta throw somebody in the streets –
> this has got to stop.  Fuck it, he can do it,
> I can do it.  This is how they should have
> played, and they might have done this before,

>you turned, we wipe your family out . . . .
>[W]hy should the rats' kids be happy, where my
>kids or your kids should suffer because I'm
>away for life.  If you take one kid, I hate to
>say it, and do what you gotta do, they'll
>fuckin' think twice.

Massino Trial Tr. at 284.

Acts of obstruction by Bonanno family members have also been proven in testimony given during various related proceedings in this district.  For example, juries in the Eastern District of New York have convicted defendants for their participation in actual and planned acts of violence against individuals suspected of cooperating against the Bonanno family, including the 1981 murder of Bonanno family captain Dominick Napolitano, the 1982 murder of Bonanno family soldier Anthony Mirra, the 1987 murder of Bonanno family captain Gabriel Infanti, the 1992 murder of Bonanno family associate Robert Perrino, and acting boss Vincent Basciano's 2002 solicitation to murder Bonanno family underboss Salvatore Vitale, due to Basciano's suspicion that Vitale was a cooperating witness.

Further, the Bonanno family has attempted to obstruct court proceedings in this district.  A cooperating witness has informed the government that an individual in the jury pool in the 2004 trial of Bonanno family boss Joseph Massino contacted Massino, via another member of the Bonanno family, to apprise Massino of the individual's status as a potential juror; the individual ultimately was not seated.  See United States v. Urso, No. 03 CR 1382 (NGG),

34

2006 WL 1210886, at *1 (E.D.N.Y. May 2, 2006).

Accordingly, courts in this district have ordered anonymous and partially sequestered juries in several prior Bonanno family cases, including the trials of Basciano, Massino and Bonanno family soldier Baldassare Amato, as well as in the trial of Basciano's co-conspirators in the murder of Randolph Pizzolo. See United States v. Mancuso, et al., No. 05 CR 060 (NGG), 2008 WL 2884397, at *9-10 (E.D.N.Y. July 23, 2008).

Given his strong connections to organized crime groups with a documented history of jury tampering and obstruction of justice, coupled with attempts to threaten, coerce or even murder witnesses in the instant prosecution, COURNOYER has demonstrated the willingness and ability to interfere with the judicial process that requires the empanelment of an anonymous and partially sequestered jury. See Vario, 943 F.2d at 241 ("demonstrable history of obstruction of justice on the part of the defendant[s] or others acting on [their] behalf" supports juror anonymity).

C.  Media Coverage

The proceedings in this matter have been the subject of intense media scrutiny with dozens of articles in local newspapers, major national media outlets and international press in multiple countries. See, e.g., Frank Donnelly, Staten Island Advance, "Alleged Mob Associate from Staten Island Admits to his Role in Billion-Dollar Drug-Trafficking Ring" (May 7, 2013) (available at:

35

http://www.silive.com/news/index.ssf/2013/05 alleged_mob_associate
_from_sta.html); Mitchel Maddux, New York Post, "Bonanno Crime
Family Associate to Plead Guilty to Role in Canadian-NYC Drug Ring"
(April 29, 2013) (available at: http://www.nypost.com/p/news/local/
brooklyn/ bonanno_crime_family_associate_canadian_
tA3lpwgHSC5gMhCY93aq4I); Allen Woods, thestar.com, "Montreal
Playboy Jimmy Cournoyer Accused of Being Kingpin in Drug Cartel
Worth Almost $1 Billion" (April 12, 2013) (available at:
http://www.thestar.com/news/canada/2013/04/12/montreal_playboy_ji
mmy_cournoyer_accused_of_being_kingpin_in_drug_cartel_worth_almos
t_1_billion.html); James Mennie, The Montreal Gazette, "Tonnes of
Dope, Montreal's Mafia and a Risk Taker Named Cournoyer" (April 10,
2013) (available at: http://blogs.montrealgazette.com/
2013/04/10/tonnes-of-dope-montreals-mafia-and-a-risk-taker-named-
cournoyer/); Paul Cherry, The Montreal Gazette, "Cournoyer Linked
to Top Tier of Montreal Underworld" (April 9, 2013) (available at:
http://www.montrealgazette.com/ news/Local+linked+tier+Montreal+
underworld/8218586/story.html); Eric Thibault, Journel de Montréal,
"Racine Veut être Jugé ici: Le Bras Droit du Caïd Cournoyer Demande
au Ministre de ne Pas L'extrader à New York" (March 19, 2013)
(available at: http://www.journaldemontreal.com/2013/03/19/racine-
veut-etre-juge-ici); Vincent Larouche, La Presse, "Procès Jimmy
Cournoyer: la Défense Attaque un Célèbre Avocat" (March 12, 2013)
(available at: http://www.lapresse.ca/actualites/quebec-canada/

36

justice/proces/201303/11/01-4630018-proces-jimmy-cournoyer-la-def
ense-attaque-un-celebre-avocat.php);    Metro Montreal, "Trafic de
Stupéfiants: Des Lavallois font face à la Justice Américaine"
(March 8, 2013) (available at: http://www.readmetro.com/en/
canada/montreal/download/20120308); David Santerre, La Presse,
"Deux Lavallois Arrêtés Pour Importation de Pot" (March 7, 2013)
(available at: http://www.lapresse.ca/actualites/ quebec-canada/
justice-et-affaires-criminelles/201203/07/01-4503395-deux-lavallo
is-arretes-pour-importation-de-pot.php); Vincent Larouche, La
Presse, "Jimmy Cournoyer, le Caïd Québécois de New York?" (February
21, 2013) (available at: http://www.lapresse.ca/
actualites/quebec-canada/justice/affaires-criminelles/201302/21/0
1-4623826-jimmy-cournoyer-le-caid-quebecois-de-new-york.php);
Vincent Larouche, La Presse, "Jimmy Cournoyer Attribue Ses Déboires
à un Avocat Controversé" (February 21, 2013) (available at:
http://www.lapresse.ca/actualites/quebec-canada/justice/
affaires-criminelles/201302/21/01-4623839-jimmy-cournoyer-attribu
e-ses-deboires-a-un-avocat-controverse.php?utm_categorieinterne=t
rafficdrivers&utm_contenuinterne=cyberpresse_vous_suggere_4623826
_article_POS1); Eric Thibault, Journel de Montréal, "Accès direct
au parrain Rizzuto" (February 12, 2013) (available at:
http://www.journaldemontreal.com/2013/02/12/acces-direct-au-parra
in-rizzuto-2); Adrian Humphreys, The National Post, "Quebec Playboy
Accused of Running $1-billion Drug Empire Linked to Montreal Mafia

37

Boss Vito Rizzuto, Prosecutors Say" (February 12, 2013) (available at: http://news.nationalpost.com/2013/02/12/quebec-playboy-accused-of-running-1-billion-drug-empire-linked-to-montreal-mafia-boss-vito-rizzuto-prosecutors-say/); Eric Thibault, Journel de Montréal, "Complicité à la Frontière: Le Réseau de Jimmy Cournoyer Aurait Corrompu des Douaniers et des Hommes Politiques" (February 6, 2013) (available at: http://www.journaldemontreal.com/2013/02/06/complicite-a-la-frontiere); Steve Mertl, Yahoo News, "Alleged Canadian Pot Kingpin Jimmy Cournoyer Earmarked $2M for 'Assassination Fund'" (February 6, 2013) (available at: http://ca.news.yahoo.com/blogs/dailybrew/ alleged-canadian-pot-kingpin-jimmy-cosmo-cournoyer-earmarked-202830706.html); Adrian Humphreys, The National Post, "Decoded BlackBerry Messages Show Quebec Playboy Accused of Pot Smuggling has $2M 'assassination fund': Prosecutors" (February 6, 2013) (available at: http://news.nationalpost.com/2013/02/06/decoded- blackberry-messages-show-quebec-playboy-accused-of-marijuana-smuggling-has-2m-assassination-fund-prosecutors-allege/); Eric Thibault, Journel de Montréal, "Un Budget Pour les Rats: Jimmy Cournoyer aurait mis de côté 2 millions $ pour faire tuer des délateurs" (February 5, 2013) (available at: http://www.journal demontreal.com/2013/02/05/budget-pour-les-rats); Frank Donnelly, Staten Island Advance, "Staten Islander in $1B Drug-ring Case Accused of Witness Tampering" (February 4, 2013) (available at:

38

http://www.silive.com/news/index.ssf/2013/02/staten_island_man_co re_member.html); Mitchel Maddux, New York Post, "Bonanno Associate and Canadian Drug Kingpin Set up $2M 'Hit' Fund: Feds" (February 4, 2013) (available at: http://www.nypost.com/p/news/ local/brooklyn/bonanno_associate_and_canadian_drug_v5tAcuq33nvYUP Et5YwV4H); SDP Noticias, ""El Chapo" Introducía Mariguana a Nueva York con Mafia Canadiense" (January 16, 2012) (available at: http://www.sdpnoticias.com/internacional/2013/01/16/el-chapo-intr oducia-mariguana-a-nueva-york-con-mafia-canadiense); QMI, Toronto Sun, "Canadian Drug Rings a Scourge for U.S. Law Enforcement: Court Documents" (January 16, 2013) (available at: http://www.torontosun.com/2013/01/16/canadian-drug-rings-a-scourg e-for-us-law-enforcement-court-documents); James Bargent, In Sight Crime, "Drug Investigation Links Sinaloa Cartel to Canadian, US Mafias" (January 16, 2013) (available at: http://www.insightcrime.org/news-briefs/drug-network-canada-mexic o-chapo); Paul Cherry, Montreal Gazette, "High-living Drug Dealer from St-Sauveur Makes Headlines in New York, Where he Faces Charges" (January 16, 2013) (available at: http://www.montrealgazette.com/news/High+living+drug+dealer+from+ Sauveur+makes+headlines+York+where+faces+charges/7823634/story .html); Havana Pura, Borderland Beat, "Alliance Between El Chapo, Canadian Mafia, Bikers, Fueled NY's Drug Trade" (January 16, 2013) (available at: http://www.borderlandbeat.com/2013/01/ alliance-

between-el-chapo-canadian.html); Zócalo Saltillo, "Desmantelan Red
de Narco Canadiense Ligada a 'El Chapo'" (January 15, 2013)
(available at: http://www.zocalo.com.mx/seccion/articulo/
desmantelan-red-de-narco-canadiense-ligada-a-el-chapo-1358288031);
La Redacción, Proceso, "'El Chapo', 'Hells Angels' y Mafia
Canadiense Introdujeron Mil MDD en Mariguana a NY" (January 15,
2013) (available at: http://www.proceso.com.mx/ ?p=330778); Eric
Thibault, Journel de Montréal, "Caïds québécois dans la mire: Les
policiers américains s'intéressent à « plusieurs » réseaux de
trafic de drogue basés à Montréal" (January 15, 2013) (available
at: http://www.journaldemontreal.com/2013/01/15/ caids-quebecois-
dans-la-mire); John L. Smith, Las Vegas Review-Journal, "Former
Vegas Mob Guy Faraci Back on Radar" (January 15, 2013) (available
at: http://lvrj.com/columns-blogs/john-l-smith/former-vegas-mob-
guy-faraci-back-radar?ref=431); Eric Thibault, Toronto Sun,
"Jet-setting Quebecer Accused of Running $800M Drug Network"
(January 15, 2013) (available at: http://www.torontosun.com/2013/
01/15/jet-setting-quebecer-accused-of-running-800m-drug-network);
Journal de Montréal, "Super Trafiquant du Quebec" (January 15,
2013); Adrian Humphreys, The National Post, "'A Great Movie
Script': Quebec Man Accused of Heading $1B Marijuana Smuggling
Operation" (January 15, 2013) (available at:
http://news.nationalpost.com/2013/01/15/a-great-
movie-script-quebec-man-accused-of-heading-1b-marijuana-smuggling

-operation/); Mail Online UK, "DEA Busts Drug Alliance Between Canadian Mafia, Bikers and Mexican Cartel Blamed for Supplying New York City with a Billion Dollars in Marijuana" (January 14, 2013) (available at: http://www.dailymail.co.uk/news/article-2262299/ DEA-busts-drug-alliance-mafia-bikers-cartel-responsible-supplying -New-York-City-nearly-billion-dollars-marijuana.html?ito=feeds-ne wsxml); United Press International, "Report Outlines Canada-NYC Pot Pipeline" (January 14, 2013) (available at: http://www.upi.com/Top_News/US/2013/01/14/Report-outlines-Canada-NYC-pot-pipeline/UPI-84811358180656/); Eric Thibault, Journel de Montréal, "Roi du «pot» à New York: Un Lavallois de 33 ans est Accusé d'avoir Vendu Pour 800 millions $ de Marijuana Depuis 2002" (January 14, 2013) (available at: http:/www.journalde montreal.com/2013/01/14/roi-du-pot-a-new-york); Eric Thibault, Journel de Montréal, "De Bugatti à Porsche" (January 14, 2013)(available at: http://www.journaldemontreal.com/2013/01/ 14/de-bugatti-a-porsche); Mitchel Maddux, New York Post, "Alliance Between Mafia, Bikers and Cartel Fueled NYC's Marijuana Trade: DEA Probe" (January 14, 2013) (available at: http://www.nypost.com/ p/news/local/nyc_in_pot_triangle_rHndDjStDb1O9ImOVEVWXL); Frank Donnelly, Staten Island Advance, "Staten Island Man Charged With Conspiracy in a Canada-U.S. Pot-smuggling Scheme" (January 11, 2013) (available at: http://www.silive.com/news/index.ssf/2013/01/ staten_island_man_charged_with_16.html); Mitchel Maddux, New York

41

Post, "Rough on 'Druggie'" (August 4, 2012) (available at: http://www.nypost.com/p/news/local/brooklyn/rough_on_druggie_qiVc JfZfwMCJ0tCQXxCg8I); Mitchel Maddux, New York Post, "Accused Drug Lord Throws 'Midnight Run'-like Tantrums Aboard Flights" (March 12, 2012) (available at: http://www.nypost.com/p/news/local/making_ run_for_it_MnYBjKYg6mLfnppR4ZSYlO); Camille Gaïor, Courrier Laval, "Deux Lavallois en Attente d'extradition Vers les États-Unis" (March 7, 2012) (available at: http://www.courrierlaval.com/ Actualites/Faits-divers/2012-03-07/article-2917812/Deux-Lavallois -en-attente-d%26rsquoextradition-vers-les-Etats-Unis/1); Cédérick Caron, L'Echo de Laval, "Trois Lavallois Font Face à la Justice Américaine" (March 7, 2012) (available at: http://www.lechodelaval.ca/2012/03/07/trois-lavallois-font-face-a -la-justice-americaine-2). Copies of these news reports are attached as Exhibit C.

The extensive media coverage of this case in both the local and international press strongly weighs in favor of an anonymous jury. Indeed, courts have ordered anonymous juries in cases with extensive media coverage even where the defendants had no documented history of jury tampering or witness intimidation. See United States v. Chammies, 864 F.2d 16, 18 (3d Cir. 1988) (affirming sequestered jury in trial of judge accused of extortion on ground that trial would generate "significant amounts of

publicity" that would interfere with the jury's ability to remain impartial).

In a criminal matter that involves organized crime, press attention is of particular concern for two reasons: (1) the danger that members and associates of the defendants' criminal enterprise will learn identifying information about jurors through press reports, and (2) the jurors' fear that press reports could lead to their identification by the criminal enterprise and the effect of that fear on their deliberations. Pre-trial publicity is a legitimate basis for impaneling an anonymous jury because such publicity can "enhance the possibility that jurors' names would become public and thus expose them to intimidation by defendants' friends or enemies, or harassment by the public." <u>Vario</u>, 943 F.2d at 240 (<u>quoting</u> <u>Persico</u>, 621 F. Supp. at 878). This, of course, is of great concern where, as here, the trial involves a violent criminal enterprise with members and associates ready and willing to engage in illegal conduct, including obstruction of justice, in order to preserve its existence.

III. **The Use of an Anonymous and Partially Sequestered Jury Will Not Deprive the Defendants of the Opportunity for Meaningful Participation in <u>Jury Selection or Diminish Their Presumption of Innocence</u>**

Once a district court determines that there is strong reason to believe that a jury needs protection, it may empanel an anonymous jury provided that it takes reasonable precautions to minimize any potential prejudice therefrom. <u>See</u> <u>Thai</u>, 29 F.3d at

43

801; <u>Amuso</u>, 21 F.3d at 1264-65; <u>Paccione</u>, 949 F.2d at 1192; <u>Vario</u>, 943 F.2d at 239; <u>Tutino</u>, 883 F.2d at 1132; <u>Persico</u>, 832 F.2d at 717-18; <u>United States v. Thomas</u>, 757 F.2d 1359, 1365 (2d Cir. 1985). A defendant has two legitimate concerns that are potentially affected by a decision to empanel an anonymous jury: (1) the right to make informed choices during the jury selection process and (2) the right to be tried by jurors who are not prejudiced by reason of their anonymity. As explained below, both of these concerns can be readily addressed.

> A.    Empaneling an Anonymous Jury Does Not
>        Burden the Defendants' Ability to Make
>        <u>Informed Choices During Jury Selection</u>

Although a defendant has the right to a meaningful <u>voir dire</u> of potential jurors, <u>see</u> <u>Rosales-Lopez v. United States</u>, 451 U.S. 182, 188 (1981), the decision as to the questions to be asked in <u>voir dire</u> largely rests within the informed discretion of the trial court. <u>See</u> <u>United States v. Silva</u>, 715 F.2d 43, 50 (2d Cir. 1983) (absent a clear abuse of discretion, trial court's ruling on questions to be asked will not be disturbed); <u>Barnes</u>, 604 F.2d at 137-40 ("As long as a defendant's substantial rights are protected by a <u>voir dire</u> designed to uncover bias as to issues in the case and as to the defendant himself, then reasonable limitations on the questioning should not be disturbed on appeal"). Indeed, as Judge Glasser has noted, "[t]he jury selection process (<u>voir dire</u>) is not a matter of constitutional dimension and the selection of an

44

anonymous jury was implicitly held to be constitutional in Barnes." United States v. Gotti, 777 F. Supp. 224, 227 (E.D.N.Y. 1991) (citation omitted).

The information that will be kept from the parties and counsel if this motion is granted is not meaningful to the jury selection process.  Names, exact addresses, and places of employment of the prospective jurors are not necessary to an informed choice of a jury panel.  Information regarding the general neighborhoods in which the prospective jurors live and the general nature of their employment is sufficient.  Indeed, in United States v. Wong, the Second Circuit approved a district court's decision to preclude disclosure of juror's names, addresses, and employers but to "question[] prospective jurors about their familiarity with the case, the defendants and crime scenes . . . their neighborhoods, marital status, employment, spouse's and children's employment, education, organizational affiliations, ethnicity, military service" and other matters.  40 F.3d 1347, 1377 (2d Cir. 1994); see also Barret, 2011 WL 6704862, at *24-25 (precluding disclosure of jurors' names, addresses and employers).

B.   The Court Can Explain the Reasons for
     Anonymity and Partial Sequestration to
     Prospective Jurors in Neutral Terms That Will
     Diminish the Risk of Prejudice to the Defendants

Numerous courts have recognized that where anonymity and sequester are necessary, jurors can receive an instruction from the court explaining those measures in a neutral way in order to

45

prevent the jury from drawing any negative inference.  Although the due process clause of the Fifth Amendment protects the presumption of innocence, "there is no _per_ _se_ rule that it may not be burdened."  _Thomas_, 757 F.2d at 1364; _see also_ _United States v._ _Scarfo_, 850 F.2d 1015, 1026 (3d Cir. 1988).  Here, the burden is slight compared to the Court's interest in safeguarding the integrity of the judicial process and can be alleviated through a proper jury instruction.

        Most commonly, courts have explained to jurors that their privacy and their identities require protection from the media and the public.  _See_, _e.g._, _United States v. Amato_, 306 Fed. Appx. 630, 2009 WL 59165, at *3 (2d Cir. Jan. 12, 2009) (summary order); _Thai_, 29 F.3d at 801; _Amuso_, 21 F.3d at 1265.  In some cases, the court has explained the jury's partial anonymity by telling prospective jurors that anonymity would allow them to feel more comfortable in giving candid answers to the personal questions asked in _voir_ _dire_. Other courts have simply advised jurors that it is "common practice" to "keep the names and identities of the jurors in confidence" and that it "is in no way unusual."  _Tutino_, 883 F.2d at 1133.  Alternatively, the court can advise "that for purposes of organization and convenience, the court will assign numbers to each juror during the selection process and trial, and will refer to jurors by number."  _Barret_, 2011 WL 6704862, at *25.  Any of those examples would provide a credible explanation to prospective jurors

in this case and would not prejudice the defendants.  See Aulicino, 44 F.3d at 1116 (use of anonymous jury does not infringe on defendants' constitutional rights where court gives jurors a "plausible and nonprejudicial reason for not disclosing their identities").

As for partial sequestration, if ordered by the Court, the government proposes that the jury be told that transportation is being provided to protect their privacy and to ensure that the trial can proceed expeditiously.  This explanation has been routinely given in cases where transportation to and from court has been provided.  See, e.g., United States v. Amato, 03 CR 1382 (Garaufis, J.) (E.D.N.Y.); United States v. Guerra, 10 CR 147 (Townes, J.) (E.D.N.Y.); United States v. Nelson, No. 94 CR 823 (Trager, J.) (E.D.N.Y.); United States v. Orena, No. 93 CR 1366 (Korman, J.) (E.D.N.Y.); United States v. Malpeso, No. 93 CR 1365 (Dearie, J.) (E.D.N.Y.); United States v. Cutolo, No. 93 CR 1230 (Nickerson, J.) (E.D.N.Y.); United States v. Thai, No. 91 CR 838 (Amon, J.) (E.D.N.Y.).

Alternatively, the court may advise the jury that "they will be escorted by the United States Marshal Service to and from the courthouse each day 'to ensure a timely start to each day of what promises to be a long trial.'"  Barret, 2011 WL 6704862, at *25 (quoting United States v. Urso, 03 CR 1382, 2006 WL 1210886, *3 (E.D.N.Y. May 2, 2006) (Garaufis, J.)).

47

<u>POINT TWO</u>

<u>THE GOVERNMENT'S EVIDENCE SHOULD BE ADMITTED</u>

I.  Evidence of Acts Done in Furtherance of the
    Narcotics Trafficking and Witness Tampering Conspiracies
    <u>Are Admissible as Direct Evidence of the Charged Crimes</u>

In its case-in-chief, the government intends to introduce evidence of the following: the above-mentioned acts of violence, witness intimidation and gun possession committed by COURNOYER and his co-conspirators in furtherance of the narcotics trafficking and witness tampering conspiracies; COURNOYER's prior foreign convictions for marijuana trafficking, MDMA trafficking and illegal use of a firearm during the course of a drug trafficking crime; and the defendants' connection to organized crime groups in the United States and Canada, as direct evidence of the charged crimes.

A.  <u>Applicable Law</u>

It is well established that "evidence of uncharged criminal activity is not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." <u>United States v. Carboni</u>, 204 F.3d 39, 44 (2d Cir. 1997). Indeed, "[w]hen the indictment contains a conspiracy charge, uncharged acts may be admissible as direct evidence of the conspiracy itself." <u>United States v. Thai</u>, 29 F.3d 785, 812 (2d

48

Cir. 1994). "An act that is alleged to have been done in furtherance of the alleged conspiracy ... is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged." Id. at 812 (2d Cir. 1994)(quoting United States v. Concepcion, 983 F.2d 369, 392 (2d Cir. 1992); see also United States v. Bagaric, 706 F.2d 42, 64 (2d Cir. 1983)("It is clear the Government may offer proof of acts not included within the indictment, as long as they are within the scope of the conspiracy.").

 B.  Violent Acts and COURNOYER's Prior Convictions
 Are Direct Evidence of the Charged Crimes

 The government intends to introduce at trial evidence of the following: (1) the use of force, kidnaping and threats to collect drug debts, including the kidnaping of CW-4's girlfriend and the extortion of the limo driver that CW-2 and CW-3 were tasked with threatening, (2) COURNOYER's use of intimidation and threats to tamper with potential witnesses against him, (3) possession of a firearm when he was arrested by the Peel Police Department in 2001, (4) COURNOYER's possession of firearms, solicitation of firearms, trafficking of firearms into Canada, (5) COURNOYER's prior foreign convictions for marijuana trafficking, MDMA trafficking and illegal use of a firearm during the course of a drug trafficking crime and (6) the defendants' connection to organized crime groups in the United States and Canada. Evidence of these acts of violence and intimidation in furtherance of the

49

charged narcotics trafficking and witness tampering conspiracies, as well as evidence of COURNOYER's prior convictions, are direct evidence of elements of the charged crimes.   Specifically, the convictions prove that within the time frame of the conspiracy COURNOYER actually possessed the types of controlled substances, MDMA and marijuana, that he is charged with conspiring to distribute and possess with intent to distribute.   Evidence of these convictions (and the underlying facts of his MDMA and marijuana possession) is, therefore, admissible. United States v. Reed, 2012 WL 928259, at *3 (E.D.N.Y. Mar. 19, 2012) (finding defendant's prior guilty pleas for criminal possession of controlled substance in third degree and fifth degree admissible as direct evidence of narcotics conspiracy where "the crimes to which [defendant] pled guilty (and the guilty pleas themselves) occurred during the charged conspiracy and are of the nature of the crimes charged in the conspiracy").   Likewise, evidence regarding COURNOYER's use of a firearm against an officer while the officer was effecting his arrest for trafficking MDMA, is an act by the defendant in furtherance of narcotics trafficking, and therefore also admissible as direct evidence of the firearm crime charged.

Further, evidence of COURNOYER's violent attempts to collect drug debts is admissible as direct evidence of the charged conspiracy.   Courts in this District have repeatedly found that "[i]ntimidation, violence, and the payment of debts is generally

50

understood to be intertwined with the management and operation of narcotics conspiracies." United States v. Khan, 591 F. Supp. 2d 202, 205 (E.D.N.Y. 2008) (finding that evidence of intimidation and violence was not "other act" evidence under Rule 404(b) where defendant was charged with being the leader of a continuing criminal enterprise); see also United States v. Estrada, 320 F.3d 173, 183 (2d Cir. 2003) (holding that "the use of violence to secure the organization's drug turf [and] carrying and using firearms to enforce its control over the drug market" are overt acts of a narcotics conspiracy). Proof of violent actions taken or discussed by co-conspirators in a narcotics operation is, therefore, not proof of "other acts," but rather direct evidence of the charged conspiracy and continuing criminal enterprise. See United States v. Miller, 116 F.3d 641, 682 (2d Cir. 1997) (evidence of numerous uncharged murders admissible as direct evidence of the narcotics conspiracy and enterprise); United States v. Becerra, 97 F.3d 669, 671 (2d Cir. 1996) ("[the Second Circuit has] 'repeatedly approved the admission of firearms as evidence of narcotics conspiracies, because drug dealers commonly keep firearms on their premises as tools of the trade.'") (quoting United States v. Vegas, 27 F.2d 773, 778 (2d Cir. 1994)); see also United States v. Chin, 83 F.3d 83, 87-88 (4th Cir. 1996) (statements about a contract murder made during a drug deal intrinsic to the defendant's drug conspiracy).

51

The violent acts committed by COURNOYER and his associates are part and parcel to the narcotics conspiracy, witness intimidation conspiracy and the continuing criminal enterprise charged. Those acts are highly probative of the existence of the conspiracy, the lengths that defendants would go to defend the drug trafficking operation and to collect debts owed to the organization, and the leadership of the continuing criminal enterprise. They are, therefore, admissible as direct evidence of the charged crimes.[8]  See United States v. Conception, 983 F.2d 369, 392 (2d Cir. 1992) (the fact that defendant had offered to cooperating witness to arrange a murder admissible to show membership of the conspiracy and the lengths to which defendant would go to protect narcotics operation); Thai, 29 F.3d at 813 (evidence regarding beating admissible to show leadership of conspiracy).

Lastly, the defendants' connections to organized crime groups are also direct evidence of the charged conspiracy. As an initial matter, the government does not seek to introduce evidence that the defendants were active members of any organized crime group. Rather, the government seeks to introduce evidence of partnerships with organized crime groups in order to (1)

---

[8]     In the event the Court believes that this evidence does fall within the ambit of Rule 404(b), the government hereby gives notice of its intent to offer at trial evidence of the uncharged crimes detailed in this section. The application of Rule 404(b) to these crimes is discussed more fully below.

demonstrate the method and means of the charged conspiracy and (2) prove a relationship between the trial defendants and other members of the conspiracy.  First, evidence of COURNOYER's partnership and association with the Rizzuto crime family and the Hells Angels is necessary to explain the viability of a conspiracy of the scope and size that COURNOYER led for nearly a decade.  Indeed, without such evidence, the jury would be left without any context to understand how COURNOYER's Enterprise could operate with relative impunity for such a period of time.  Second, evidence of the trial defendants' association with the Rizzuto crime family demonstrates their tie to one another and explains the establishment of trust between them. The historical ties between the Rizzuto and Bonanno families also serves to explain the development of the conspiratorial relationship between COURNOYER in Montreal, and his primary distributor in New York - Bonanno associate JOHN VENIZELOS. Moreover, evidence of COURNOYER's direct connection, financial backing and protection from the Rizzuto family is admissible evidence to show his leadership in the charged CCE.  It is precisely COURNOYER's high-level criminal associations that have allowed him to rise to his position as the head of a vast international drug empire with operations spanning the entire North American continent.

II.  Evidence of Prior Bad Acts and Prior Convictions
     of the Defendants Are Admissible Under FRE 404(b)

Although the uncharged acts described in Section I are direct evidence of the charged continuing criminal enterprise and narcotics conspiracy, and therefore are admissible without reference to Rule 404(b), evidence of these acts unquestionably would be admissible under that rule as well.  Thus, in an abundance of caution, and in the event that the Court finds that any of the proffered evidence falls within the ambit of Rule 404(b), the government hereby gives notice of its intent to offer at trial evidence of the uncharged crimes detailed in this memorandum pursuant to Rule 404(b).

A.  Applicable Law

Rule 404(b) provides that evidence of "other crimes, wrongs or acts" may not be admitted to prove bad character, but may be admissible for other purposes, such as to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  Fed. R. Evid. 404(b).  The standards governing the admissibility of evidence under Rule 404(b) are well established:

> First, the district court must determine if the evidence is offered for a proper purpose, one other than to prove the defendant's bad character or criminal propensity.  If the evidence is offered for a proper purpose, the district court must next determine if the evidence is relevant to an issue in the case, and, if relevant, whether its probative value is substantially outweighed by the

> danger of unfair prejudice.  Finally, upon
> request, the district court must give an
> appropriate limiting instruction to the jury.

United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992)

(citation omitted); see also Huddleston v. United States, 485 U.S.

681, 685 (1988); United States v. Tarricone, 996 F.2d 1414, 1421

(2d Cir. 1993).

Although evidence of other crimes or wrongs is "not

admissible to prove the character of a person in order to show

action in conformity therewith, Fed. R. Evid. 404(b) . . . permits

admission of such evidence for other purposes, such as to show

knowledge or intent." United States v. Aminy, 15 F.3d 258, 260 (2d

Cir. 1994); Huddleston, 485 U.S. at 687-88.  The Second Circuit has

long viewed Rule 404(b) as an inclusive rule allowing "other acts"

evidence if the evidence is offered to prove something other than

criminal propensity, is relevant to the crime for which the

defendant stands trial and satisfies the balancing test of Federal

Rule of Evidence 403.  See, e.g., United States v. Carboni, 204

F.3d 39, 44 (2d Cir. 2000); United States v. Germosen, 139 F.3d

120, 127 (2d Cir. 1998).

B.   Evidence of Violence and the Defendants' Connection to
     Organized Crime Groups Are Admissible to Show the
     Background of the Conspiracy

Evidence regarding acts of violence done in furtherance

of the conspiracies charged as well as the defendants' connection

to organized crime groups are admissible under Rule 404(b) to show

the background of the conspiracy and to explain the basis for the
co-conspirators' relationship of mutual trust.  Specifically, as
stated above, the government's evidence at trial will show that
beatings and assaults were carried out by members of the COURNOYER
Enterprise at COURNOYER's direction in order to collect drug debts.
The government's evidence will also show that a paramour of one
such individual who owed a drug debt to the COURNOYER Enterprise
was kidnaped at gunpoint, assaulted and threatened.  Background
evidence of this type is routinely admitted under Rule 404(b).
United States v. Diaz, 176 F.3d 52, (2d Cir. 1999) (holding that,
in prosecution of members of street gang on drug distribution and
racketeering charges, evidence of uncharged drug sales and acts of
violence committed on behalf of the gang was relevant to inform the
jury how the gang's racketeering and drug conspiracies evolved, and
how illegal relationships and mutual trust developed between
coconspirators, and the evidence was not unduly prejudicial even
though defendants conceded that they were members of the gang, as
disputed issues remained, including the existence, nature and
operations of the criminal enterprise, and the related racketeering
and drug conspiracies, and the other crimes evidence had
significant probative value as to these disputed matters); United
States v. Rosa, 11 F.3d 315, 334 (2d Cir. 1993) ("We have held
repeatedly that it is within the court's discretion to admit
evidence of prior acts to inform the jury of the background of the

conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators."); United States v. Pipola, 83 F.3d 556, 566 (2d Cir. 1996) ("One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case); Id. at 566 (Proof of the background of a conspiracy "may also be used to help the jury understand the basis for the co-conspirator's relationship of mutual trust"); United States v. Alcaide, 112 F.3d 505, 1997 WL 225121, at *2 (2d Cir. 1997) ("[B]ackground information is routinely admitted to explain the origins of a conspiracy.").

Evidence of the trial defendants' ties to organized crime groups is likewise admissible to demonstrate the historical relationships between co-conspirators and the trust that developed between them. United States v. Amato, 31 Fed. Appx. 21, 25 (2d Cir. 2002) (finding that district court's admission of evidence of defendants' ties to organized crime in trial for armed robbery conspiracy and related charges was not in error because evidence of pre-existing relationships with Gambino crime family helped explain how defendant came to participate and lead robbery plan and corroborated witness's testimony that he initially lied to federal agents for fear of his safety due to defendant's ties to organized

crime); <u>Barret</u>, 2011 WL 6704862, *11-12 (holding that defendants' membership in and association with a violent Jamaican drug posse was admissible evidence in a CCE and narcotics conspiracy case as background evidence "to help the jury understand the historical development of the illegal relationships and levels of trust among the co-conspirators, and the conspiracy itself"). Here, COURNOYER and TALONI's ties to the Rizzuto crime family is important evidence to explain why COURNOYER trusted TALONI to manage his cocaine operation in Southern California and receive large amounts of cash from marijuana trafficking in the New York area. Accordingly, evidence of both trial defendants' association with the Rizzuto crime family is properly admissible evidence at trial.

    C.   Evidence of COURNOYER's Possession and Use of Firearms
         Is Admissible to Show Knowledge and Intent,
         Leadership and Access to Firearms

         Evidence that COURNOYER used and possessed firearms is admissible under Rule 404(b). The government's evidence will show that COURNOYER smuggled firearms from the United States to Montreal for use by his drug trafficking organization as well as for members of the Rizzuto crime family. The evidence will also show that COURNOYER directed other co-conspirators to possess firearms. This evidence is relevant to show COURNOYER's knowledge of firearms, and to show that his possession was not by mistake or accident. In addition, this evidence is probative of COURNOYER's leadership of

the COURNOYER Enterprise in that he had the power to direct others
to commit crimes in furtherance of the conspiracy.

    D.    COURNOYER's Prior Convictions for Distribution of
<u>Marijuana and MDMA and Use of a Firearm Are Admissible</u>

        In narcotics trafficking cases, evidence of prior
narcotics transactions is regularly admitted to prove the
defendant's intent, knowledge and absence of mistake during the
charged offenses. <u>See</u> <u>United States v. Santiago</u>, 199 F. Supp. 2d
101, 109-110 (S.D.N.Y. 2002) (defendant's "involvement in a prior
narcotics transaction is probative of his intent or knowledge in
connection with the charged conspiracy," especially to rebut his
claim of innocent association with individuals in the area where
the conspiracy operated); <u>United States v. Paulino</u>, 445 F.3d 211,
221-22 (2d Cir. 2006) (prior narcotics conviction admissible to
prove knowledge and intent where defendant challenged constructive
possession of narcotics found in his closet); <u>Pitre</u>, 960 F.2d at
1119-20 (admitting prior narcotics offenses, <u>inter</u> <u>alia</u>, to
establish knowledge and intent); <u>United States v. Martino</u>, 759 F.2d
998, 1004-05 (2d Cir. 1985) (admitting narcotics conviction to show
intent to participate in conspiracy); <u>United States v.
Garcia-Montalvo</u>, 885 F. Supp. 99, 100-01 (S.D.N.Y. 1995) (admitting
circumstances of narcotics conviction to establish knowledge).

        Similarly, where firearms possession is charged evidence
of prior possession of firearms regularly is admitted to prove the
defendant's access to weapons, knowledge, intent and absence of

59

mistake.  See United States v. Barris, 377 Fed. Appx. 93, 94 (2d
Cir. 2010)(holding prior arrest and conviction for firearms
possession admissible because it was relevant to possession of a
firearm in furtherance of a narcotics offense charge); see also
United States v. Slaughter, 248 Fed. Appx. 210, 213 (2d Cir. 2007)
(finding evidence of prior firearm possession admissible to show
"access to such a weapon"); United States v. Zappola, 677 F.2d 264,
270 (2d Cir. 1982)(same).   Thus, COURNOYER's conviction for
marijuana production and marijuana distribution stemming from his
arrest in 1998 and his conviction for possession of MDMA and
possession of a firearm stemming from his arrest in 2001 are
admissible to show COURNOYER's intent and knowledge of marijuana,
MDMA and firearms.  The firearms conviction also demonstrates that
COURNOYER had access to firearms during the charged conspiracy.

III. The Proffered Evidence Is Not Unfairly Prejudicial

         Otherwise admissible evidence may be excluded at trial
if its probative value is "substantially outweighed" by the
danger of unfair prejudice.  See Fed. Rule Evid. 403. This is
true regardless of whether the Court considers the evidence of
uncharged crimes to be direct evidence of the charged conspiracy
or to be governed by Rule 404(b).  The fact that evidence is highly
probative does not mean it is unfairly prejudicial. Rather, the
touchstone for unfair prejudice is the extent to which the evidence
creates a risk of conviction because of propensity.   "The term

60

'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from the proof specific to the offense charged." Old Chief v. United States, 519 U.S. 172, 180 (1997). Put another way, unfair prejudice "'means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" United States v. Nachamie, 101 F. Supp. 2d 134, 141 (S.D.N.Y. 2000) (quoting Rule 403, Advisory Committee Notes, 1972 Proposed Rules).

In the present case, the probative value of the evidence of uncharged crimes that the government seeks to admit is great, and is not substantially outweighed by the danger of unfair prejudice to the defendants. The Second Circuit has stated repeatedly that Rule 403 favors the admission of evidence where the uncharged crimes "did not involve conduct more serious that the charged crime[s]." United States v. Williams, 205 F.3d 33-34 (2d Cir. 2000). The defendants are charged with participating in a narcotics trafficking organization. Plainly, evidence related to the details of their narcotics trafficking offenses does not raise these sorts of concerns as that evidence does not involve "conduct any more sensational or disturbing than the crimes [] charged." Pitre, 960 F.2d at 1120 (quoting United States v. Roland-Zapata, 916 F.2d 795, 804 (2d Cir. 1991)).

61

Evidence of uncharged violent crimes related to furthering the charged narcotics conspiracy, witness intimidation conspiracy and continuing criminal enterprise is also not unfairly prejudicial.  COURNOYER is charged with possessing and using firearms in furtherance of the drug trafficking charges in violation of 18 U.S.C. § 924(c).  Evidence of COURNOYER's involvement in the use and possession of firearms is not merely highly probative, but, in fact, the only evidence that could possibly be offered to prove the charged conduct.  In short, where, as here, the defendant is charged with possessing and using firearms in furtherance of drug trafficking, the government must be allowed to provide evidence proving that the defendant took exactly those actions.  The only prejudice is the permissible prejudice that this evidence may convince the jury that defendant committed the charged crimes.

Evidence of violence by COURNOYER and his co-conspirators, including the use of guns during the above-mentioned kidnaping and assaults against individuals who owed COURNOYER money, should be admitted not only to prove the elements of the charged 924(c) offense, but also because it is highly probative of the existence of the conspiracy and continuing criminal enterprise, the membership of the conspiracy, the leadership of the conspiracy and the goals of the conspiracy.  Courts have consistently found that evidence of violent acts by co-conspirators is more probative

62

than prejudicial.  See Miller, 116 F.3d at 682 (approving of trial court's decision that evidence of "murders was relevant to show the existence and nature of the enterprise and the conspiracy and that the probative value of the evidence was not substantially outweighed by its potential for unfair prejudice"); United States v. Mejia, 545 F.3d 179, 207 (2d Cir. 2008) (allowing evidence of prior shootings because "[w]hen a defendant engages in a criminal enterprise which involves very serious crimes, there is a likelihood that evidence proving the existence of the enterprise through its acts will involve a considerable degree of prejudice."); see also United States v. Garcia Abrego, 141 F.3d 142, 174-175 (5th Cir. 1998)(evidence that defendant ordered uncharged murders admissible to prove CCE charge); United States v. Gibbs, 190 F.3d 188, 217-218 (3rd Cir. 1999)(evidence that defendant used violence to further the illegal objectives of the cocaine conspiracy admissible); Chin, 83 F.3d at 87-88 (evidence regarding contract killing scheme emphasized the violent and dangerous context of a heroin deal, and was inextricably intertwined with defendant's crime of selling heroin and conducting an ongoing criminal enterprise); United States v. Portillo-Quezada, 469 F.3d 1345, 1354 (10th Cir. 2006) (murder evidence not unduly prejudicial where admitted as direct proof of narcotics conspiracy).  Similarly, evidence of COURNOYER's 1998 and 2000 convictions for marijuana possession and his 2001 conviction for

63

possession of MDMA and use of a firearm is not more prejudicial than probative because it is no different from charged conduct.

Finally, any possible prejudice can be eliminated through a proper limiting instruction.  See United States v. Mickens, 926 F.2d 1323, 1328-29 (2d Cir. 1991); United States v. Ortiz, 857 F.2d 900, 903 (2d Cir. 1988); United States v. Levy, 731 F.2d 997, 1002 (2d Cir. 1984).

IV.   Pursuant to Rule 609, if COURNOYER Elects to Testify, the Government Should be Allowed to Cross-Examine the Defendant Regarding Any Criminal Convictions

Rule 609(a)(1) provides that, for impeachment purposes, evidence of a defendant's prior conviction "shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused," the crime is punishable by over a year of imprisonment and the defendant was released from any resulting incarceration within the past ten years.  Fed. R. Evid. 609(a)(1)(emphasis added).  Where the conviction satisfies the conditions of Rule 609, cross-examination may be permitted on "the underlying facts or details of a crime of which a witness was convicted, [. . . and] the 'essential facts' of the conviction, including the nature or statutory name of each offense, its date, and the sentence imposed."  United States v. Estrada, 430 F.3d 606, 616 (2d Cir. 2006).

In deciding whether specific convictions are admissible as impeachment evidence, courts generally consider five factors: (1) the impeachment value of the prior crime; (2) the date of the conviction and the defendant's subsequent history; (3) the degree of similarity between the past crime and the charged crime; (4) the importance of the defendant's testimony; and (5) the centrality of the credibility issue. See United States v. Hayes, 553 F.2d 824, 828 (2d Cir. 1977); United States v. Jimenez, 214 F.3d 1095, 1098 (9th Cir. 2000); United States v. Smith, 131 F.3d 685, 687 (7th Cir. 1997); United States v. Sloman, 909 F.2d 176, 181 (6th Cir. 1990); Jones v. City of New York, 2002 WL 207008, at *2 (S.D.N.Y. Feb. 11, 2002); Daniels v. Loizzo, 986 F. Supp. 245, 249 (S.D.N.Y. 1997).

Upon weighing these factors, the Court should permit cross-examination on defendant COURNOYER's 1998 and 2000 convictions for marijuana possession and his 2001 conviction for possession of MDMA and use of a firearm, as detailed above.

First, the government anticipates that if the defendant takes the stand he is likely to assert, as a defense, that he was unaware of or not involved in the marijuana and MDMA trafficking and did not possess a firearm. Convictions that show a defendant's prior relationship to Marijuana, MDMA and firearms would be powerful impeachment evidence. See United States v. Reed, 572 F.2d 412, 426 (2d Cir. 1978)(assault and felonious possession of a

weapon convictions, among others); <u>United States v. Ortiz</u>, 553 F.2d 782, 785 (2d Cir. 1977) (narcotics distribution conviction). Second, COURNOYER's convictions are within the time frame of the charged conduct.

Third, COURNOYER's testimony and the jury's determination of his or her credibility will be critical to the outcome of the trial. <u>See</u> <u>Ortiz</u>, 553 F.2d at 785.

In sum, the proof of defendant COURNOYER's prior convictions for conduct that is similar to the charged crimes or relates to truthfulness will assist the jury in determining the defendant's credibility, and therefore falls well within the class of evidence admissible for impeachment purposes under Rule 609(a)(1). <u>See</u> <u>United States v. Alexander</u>, 48 F.3d 1477, 1489 (9th Cir. 1995) (finding it "not surprising that the [district] court was unwilling to let a man with a substantial criminal history misrepresent himself to the jury, with the government forced to sit silently by, looking at a criminal record which, if made known, would give the jury a more comprehensive view of the trustworthiness of the defendant as a witness").

<u>CONCLUSION</u>

For the foregoing reasons, an anonymous and partially sequestered jury should be ordered for the trial of this case. In addition, the government's proffered evidence should be admitted as direct evidence of the charged crimes or, alternatively, as other acts evidence pursuant to Rule 404(b).

Dated:     Brooklyn, New York
           May 7, 2013

                                   Respectfully submitted,

                                   LORETTA E. LYNCH
                                   United States Attorney
                                   Eastern District of New York
                                   271 Cadman Plaza East
                                   Brooklyn, New York  11201

Steven L. Tiscione
Gina M. Parlovecchio
Amir H. Toossi
Tanisha Payne
Assistant U.S. Attorneys
     (Of Counsel)